[S. F. No. 15957. In Bank.—April 29, 1938.]

BATTISTA SADA et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION and AGNES M. O'CONNOR, Respondents.

Hubbard & Hubbard for Petitioners.

W. N. Mullen, as *Amicus Curiae*, on Behalf of Petitioners.

Everett A. Corten for Respondents.

THE COURT.—This proceeding in *certiorari* was instituted by petitioners Sada and Dantoni, copartners doing business as Loop Bowling Alley, to secure the annulment of an award made against them by the Industrial Accident Commission for the death of Martial Hainque.

The commission found that on March 7, 1937, Martial Hainque, while working as a pinsetter for petitioners, sustained an injury which resulted in his death on March 10th, and that Agnes M. O'Connor, the mother of decedent, was a partial dependent, entitled to a death benefit of $1560, and $150 for burial expenses. Petitioners challenge the sufficiency of the evidence to support (1) the finding of employment, and (2) the finding which fixes the amount contributed by decedent to his mother's support.

On the subject of employment, the only support for the commission's finding, other than such inferences as may be drawn from the evidence as a whole, is certain hearsay testimony which was flatly contradicted by persons who witnessed decedent's alleged injury. The record shows that decedent was a pinsetter who had been employed intermittently in various bowling alleys in San Francisco; that prior to 1937 he had worked for petitioners, but that he was an inveterate drinker, and frequent intoxication prevented any regular pursuit of his occupation. Admittedly decedent called at petitioners' bowling alley on the evening of March 7th, and there sustained an injury. The conflict of evidence concerns the manner in which the injury occurred—whether decedent was hit in the head by a flying pin while working temporarily as a pinsetter, or whether decedent was merely visiting in

the spectators' section of the alley, and fell down from drunkenness, hitting his head against a railing.

Petitioner Sada, John Roumas, the night manager of the bowling alley, and two pinsetters regularly employed there, Black and Kelly, all of whom were at the alley on March 7th, and knew decedent, testified positively that decedent did not work on that evening, and was not injured while setting up pins; that on the contrary, decedent called at the alley about midnight in a condition of intoxication; that he remained in the spectators' section, and about 12:30 A. M. (March 8th), it was observed that he had fallen face downward just outside of the fence which surrounded the bowling lanes, with his head close to the fence railing; that it was thought that he was merely drunk, not injured, and that he was placed on a couch in another room to recuperate. Petitioner Sada stated that many times previously when decedent was drunk, he had been put in the back room to sleep for a night or two; that therefore when he (Sada) left for his home about 3 o'clock in the morning, he did not disturb decedent; that he returned to the alley about 10:30 A. M., and talked with decedent; that decedent said he felt "dizzy", but nevertheless walked to the bar, had a plate of soup, and then went back and lay down again; that about 4 o'clock in the afternoon, as decedent seemed to be getting worse, an ambulance was called and decedent was taken to the Harbor Emergency Hospital, where he was booked as an alcoholic but, upon diagnosis, was found to be severely injured, having sustained a fracture of the vertebra, or in common parlance, a "broken neck", with the complication of pneumonia.

Shortly after decedent's arrival at the hospital, about 5:20 o'clock of the afternoon of March 8th, Police Officer Jack W. Leishman called to investigate the case, and talked with decedent. Officer Leishman, when testifying before the commission in this proceeding, gave the following version of his conversation with decedent: "At my arrival he (Martial Hainque) was on the table in the treatment room in a paralyzed condition . . . he stated to my partner and myself, who was Officer Guisto, that he received an injury about 8 p. m. on March 7th while setting up pins in the Loop Bowling Alley at 238 Columbus Avenue, and that he was asked to do so by Mr. Sada. . . . And I asked him if he was employed by Mr. Sada, or by the Loop Bowling Alley, and

he said that he was from time to time, that whenever there was anything to do why he was, I understand, or he so made it clear to me, that he wasn't permanently employed, that he was sort of hanging around there and if there was anything to do why—in the line of setting up pins—if there was a job why he would get up and do it—that is he was in this particular case. I asked him if he was steadily employed and he stated 'No', but that he was asked to set these pins up by Mr. Sada on this particular occasion, and that was about eight o'clock Sunday night, which was March 7th, and he didn't remember very much that transpired between that time and the time that he was conveyed to the hospital. He was—he said that he laid down or was laid down on a couch or cot or something there at the bowling alley, and he was sent into the hospital. . . . He said that he was stooping over, setting up pins, when suddenly a bowling pin struck him in the head, and that he fell backward. . . . The only apparent abrasion that I noticed was a little abrasion on his forehead, that I can recall. He received no medical attention for anything in that line. . . . There was a slight odor of alcohol on his breath. . . . Q. When you talked to him, was his mind apparently clear? A. Yes, I would say that it was.''

Dr. Joseph S. McGuinness, the hospital physician who examined decedent prior to the arrival of Officer Leishman, testified that decedent told him that the night before, while working in the pit of the bowling alley setting up pins, he had been struck by a pin on the back of the neck and suffered paralysis; that they had laid him down in the hall and kept him there all night. Dr. McGuinness expressed the view that at the time of this conversation decedent's mind was perfectly clear. He also testified, however, that he detected a strong odor of alcohol upon decedent.

Mrs. Agnes M. O'Connor, decedent's mother, testified that on March 9th the hospital telephoned that her son was seriously injured; that she went to him at once; that he was very ill, and she did not question him much, but that he stated he was hurt over in the bowling alley where he was working; that he was hit with a pin.

It will be noted that according to decedent's statements to the police officer and physician, he was injured about 8 o'clock in the evening, whereas the bowling alley people

claimed that decedent did not arrive at the alley until about 12, midnight. The statements of two other witnesses tended to corroborate the latter testimony. Mr. Reavis, the manager of the hotel where decedent was rooming, testified that he saw decedent leave the hotel about 11:30 with a Mr. Russell, and that decedent appeared to be sober. Mr. Russell testified that he first saw decedent about 5 o'clock in the afternoon, and that thereafter between that time and 11:30 in the evening he saw decedent at least four times, sitting in the hotel lobby; that at 11:30 he and decedent left the hotel together, and he walked with decedent as far as Market and Third Streets; that decedent seemed to be sober, and said he was going to the bowling alley where he had been working.

Petitioners placed in evidence a book containing a record of the names and earnings of pinsetters employed by them. Decedent's name did not appear in this record. However, it was admitted that the names of temporary pinsetters were not always listed.

Testimony taken at the coroner's inquest was made a part of the record in this proceeding. This evidence added to the conflict of proof. One witness testified that decedent had told him that a month or two previously he had been struck in the back with a bowling pin during a fight in the Hub Bowling Alley (an alley not owned by these petitioners). The manager of the Hub Bowling Alley testified that some months previously he had employed decedent but had discharged him because he was drunk. There was medical evidence that decedent was suffering from an old injury, and not a recent fracture. In contradiction of the testimony of Dr. McGuinness that decedent had sustained a recent fracture of the vertebra, causing the development of paralysis within 24 to 48 hours thereafter, Dr. Leland, who examined decedent subsequent to his treatment at the emergency hospital, stated that he could not find any fracture; that he found merely hypermobility, and that the dislocation apparently had been reduced surgically because it was perfectly in line; that there was no bruising or other evidence of injury other than a skinned chin and forehead; that "with a spinal cord injury, you afterward develop paralysis below that level, and this man went ahead and developed a pneumonia which was the actual cause of his death"; and that a contributory factor

was decedent's fatty enlarged liver, which was obviously due to alcoholism.

From this confusion of proof it will be noted that the hearsay testimony given by Officer Leishman, Dr. McGuinness, and Mrs. O'Connor, is the only evidence which directly supports the finding that decedent was injured in the course of his employment by petitioners.; that, however, the commission credited this testimony and refused to believe the statements of the eye-witnesses who testified on behalf of petitioners, all of whom were in a position to benefit by the prosperity of the bowling alley, or *vice versa*, particularly as petitioners had been unable to secure compensation insurance for that class of risk. Petitioners, in applying for a rehearing before the commission, offered newly discovered evidence, alleging that by continual inquiry they had succeeded in locating six persons who were in the bowling alley as visitors at the time decedent fell, and who could testify that decedent was intoxicated, and was not working. The commission refused to receive this testimony. While in one sense it might have been merely cumulative, in another sense, if credited, it might have carried sufficient weight to turn the case, in that it would have afforded a corroboration by disinterested spectators of the testimony of the bowling alley people.

A full review of this record leads us to agree with petitioners that the showing in support of the finding of employment is indeed meager, and to a reviewing court it seems that the trier of the facts might well have reached an opposite conclusion, or at least have permitted introduction of the proof proffered in the application for rehearing. However, under the rule which obtains in proceedings before the commission (27 Cal. Jur., sec. 149, p. 479), the fact that a finding is supported solely by hearsay does not of itself invalidate the finding or stamp the proof as too unsubstantial to be credited. Inasmuch as hearsay is admissible, the weight to be given such evidence is a question for determination by the commission, and if in its judgment the evidence carries convincing force, it may be sufficient in itself to sustain an award (27 Cal. Jur., sec. 152, p. 483). Because of this rule, and because the thrice-told tale of decedent, as recounted by the police officer and physician—two disinterested witnesses who should have been well qualified to judge of decedent's mental condition—has some support in inferences which may

be drawn from the evidence as a whole, we are reluctant to brand said proof as too unsubstantial or highly improbable to support the finding of employment. Despite this conclusion, however, the cause will have to be remanded, as will hereafter appear, due to the insufficiency of the evidence to support an award in the sum fixed by the commission. Therefore, in view of the condition of this record, and in fairness to petitioners, we think that upon the further proceedings before the commission, the cause as a whole should be reopened, and an opportunity should be accorded both sides to produce additional proof on all issues. It is hoped that a showing can be made which will establish to a greater degree of certainty the true fact of the matter of employment.

The further contention of petitioners is that the commission erred in computing the amount which decedent contributed to his mother's support, and that the finding on this subject is without sufficient support in the evidence. This contention must be sustained.

The commission found, and the finding has support, that decedent's mother was partially dependent upon him. A partial dependent is entitled to a benefit, in addition to burial expense, fixed by statute at three times the annual amount devoted by the deceased to the support of such dependent, provided said amount does not exceed three times the average annual earnings of the deceased. (27 Cal. Jur., sec. 195, p. 542.) The commission found that this decedent contributed to his mother annually the sum of $520 (an average of $10 per week); that she was therefore entitled to a death benefit of $1560, in addition to burial expense; and that the payments were based on earnings of $17.50 a week.

The evidence showed conclusively that the commission was not warranted in basing payments to the partial dependent upon earnings fixed at so high a figure, and also that decedent's earning capacity could not have permitted him to make contributions to his mother to the extent found. It is true that the mother testified: ''Q. How much did he contribute to your support? A. Various sums. Some weeks $12.00; some weeks $10.00; some weeks $15.00, and so on. Q. How did he pay this to you? A. By the day. He gave it to me when he had little jobs places.'' But the other evidence showed that decedent, after paying his own room rent and incidentals, could not have had left for contribution any

such sums, and furthermore, that the money which he gave his mother was used in part for his own support, as he took three meals a day at his mother's apartment, and also had her do his laundry.

As a matter of fact, the evidence failed to show that decedent had had any regular employment whatsoever during a period of several months prior to his death. The only indication that he may have had some earnings during that time is found in the testimony of Mr. Russell, who stated: ''He (decedent) told me he made from $2.00 to $3.00, sometimes more, a day . . . we talked a couple of times about it. I had set up pins and I couldn't see how he made quite so much money at it or anything, but he was laughing and joking and said he had lots of friends out there and everything, and he made more money by drinks than by setting pins.'' In view of the complete absence of any other showing of employment, this testimony can scarcely be said to constitute a sufficient basis for the commission's finding.

On the subject of the average earnings of a pinsetter, the evidence showed that a pinsetter who was permanently employed, working eight hours a day seven days a week, would have average daily earnings of from $1.50 to $2.50, or if it were a good day and a good pinsetter, he could make $3; that the average was $2 a day. The records introduced in evidence by petitioners showed that the earnings of pinsetters regularly employed by them averaged $10 per week, and often less. Thus the evidence showed that even if decedent had been a good pinsetter, regularly employed, his maximum average weekly earnings would not have exceeded $14. It is obvious that he could not have supported himself from this sum and still have contributed $10 to $15 a week to his mother's support. Not only this, but the evidence also showed without contradiction that decedent was not a regular pinsetter; he was at most merely an intermittent pinsetter. The commission therefore erred in basing the payments herein upon the average earnings of a regular pinsetter.

One witness testified that decedent had been on relief. Petitioners, in their application to the commission for a rehearing, alleged that they had investigated this statement and found it to be true, and they proffered a letter from the Director of the California State Relief Administration stating that the relief records showed that decedent had dis-

claimed employment during December, 1936; that he had received relief thereafter; that on January 7th he had received $8.20, and subsequently twice a month until March 31, 1937, he had received $9.13. The commission refused this proof.

From the above *résumé* it will be seen that the record contains no support for the allowance of so large a sum as awarded by the commission. Additional evidence should be taken on this issue to ascertain, if possible, both the average earnings of an intermittent pinsetter and whether decedent actually contributed more than a nominal sum to his mother's support, thus laying the basis for computation of a proper award, should the commission retain its view that decedent was in fact injured in the course of his employment.

The award is annulled, the cause remanded, and the commission is directed to take such further proceedings, consistent with the views above expressed, as it may deem advisable.