[Civ. No. 16483.   First Dist., Div. One.   Feb. 16, 1956.]

SAMUEL L. BERNSTEIN, M.D., Appellant, v. ALAMEDA-CONTRA COSTA MEDICAL ASSOCIATION (an Unincorporated Association), Respondent.

Tobriner, Lazarus, Brundage & Neyhart for Appellant.

Peart, Baraty & Hassard and Alan L. Bonnington for Respondent.

WOOD (Fred B.), J.—Samuel L. Bernstein, M.D., was expelled from the Alameda-Contra Costa Medical Association upon a finding by the association's council that he was guilty of seven charges of violation of the Principles of Medical Ethics of the American Medical Association.[1]

Upon appeal to the council of the California Medical Association, he was absolved of one of the charges but the decision of the local council was affirmed in all other respects. Upon appeal to the Judicial Council of the American Medical Association the action of the state council was affirmed.

He then brought this action seeking a writ of mandate to restore him to membership and monetary damages for injuries allegedly sustained. The trial court found the evidence sufficient as to three of the remaining charges (insufficient as to the other three) and that Bernstein is entitled to no relief. He has appealed. The association has not.

We will consider the three remaining charges, designated by the parties as the Hill, the Muir, and the Enea cases.

---

[1]Section 14 of chap. I of the local association's by-laws declares that a "member who . . . violates . . . any of the provisions of the Principles of Medical Ethics of the American Medical Association, shall be liable to censure, suspension or expulsion."

Section 14 also provides that "Members expelled from this association for any cause shall be eligible for membership after one year from date of expulsion, and on the same terms and in like manner as original applicants."

## THE HILL CASE

The charge was that Dr. Bernstein had violated section 4[2] of article IV of chapter III of the Principles of Medical Ethics in that on July 23, 1949, he "rendered a report concerning one George Hill, then deceased. Said report concerning George Hill was addressed 'To Whom It May Concern,' and contained several statements of criticism by Dr. Bernstein of a pathological report previously made by Dr. J. M. Ellis. Specifically, Dr. Bernstein described Dr. Ellis as a pathologist 'who is not a certified pathologist, and who has rendered a very inexpert report' on the case. He again referred to Dr. Ellis as a 'rather inept and inexpert individual.' He further stated that 'a more experienced pathologist would have examined the heart a little more thoroughly.' Further on in the report he stated, 'Here, again, I must comment about the inexpertness of the pathologist,' referring again to Dr. Ellis."

It was stipulated that on October 5, 1948, Dr. Ellis performed an autopsy upon the body of George Hill and rendered to the coroner a pathological report to the effect that Hill probably died of natural causes, although recognizing the possibility of industrial injury as the cause, and later submitted the report to Hill's employer at the latter's request in regard to an industrial accident hearing concerning the death of Hill; and that on July 23, 1949, Dr. Bernstein, in response to a request by the attorney for Hill's widow, who was the applicant in the industrial accident proceeding, prepared a pathological report and delivered it to the widow's attorney, who thereupon turned it in to the Industrial Accident Commission. Both reports were introduced in evidence before the local medical council.

The Bernstein report was based upon a study of various papers, including "the copy of the inquest, the report of Dr. T. A. Miller, radiologist of St. Francis Hospital, the X-ray report issued by him, the report by Dr. Carl B. Eichorn, St. Francis Hospital, and report of the nurse on duty at the Columbia Steel Mill Hospital who first attended George Hill." Dr. Bernstein expressed the opinion that "George Hill's

[2]Section 4 reads as follows:
"When a physician does succeed another physician in charge of a case, he should not disparage, by comment or insinuation, the one who preceded him. Such comment or insinuation tends to lower the confidence of the patient in the medical profession and so reacts against the patient, the profession and the critic."

death was caused directly by the injury." He set forth in considerable detail the several factors which led him to that conclusion, in the course of which he analyzed the autopsy report, indicating various features thereof which he deemed inadequate or erroneous. In the course of this analysis Dr. Bernstein made the remarks concerning Dr. Ellis and his report which are quoted in the charge.

Counsel for the accusers (1) stipulated that Dr. Ellis was not a certified pathologist, (2) stated that Ellis was amply qualified in fact as a licensed physician who had specialized in pathology for some years, and (3) contended that the question whether Ellis was a good or bad pathologist was not an issue, the question being whether Dr. Bernstein's conduct was ethical. The referee stated that "the qualifications of Dr. Ellis or the competency of the particular report that Dr. Ellis rendered is entirely immaterial in so far as the charge herein made is concerned." Apparently the council concurred in that view.

It further appears that Dr. Bernstein's report was given to the attorney for the widow of Hill for use as evidence in support of her claim for benefits under the workmen's compensation law,[3] and was used for that purpose. It was brought to Dr. Ellis' attention by the attorney for the employer in the industrial accident proceeding, whereupon Dr. Ellis wrote the employer's attorney, at the latter's request, an analysis of Dr. Bernstein's report, apparently for the use of the employer in that proceeding. There is evidence that the Industrial Accident Commission made an award in the widow's favor.

It was Dr. Ellis who brought the Bernstein report to the attention of the medical association, nearly two years after its rendition.

It seems abundantly clear that Dr. Bernstein's report was requested by a litigant for use as evidence in a judicial proceeding; was prepared and delivered by the doctor, in response to that request, solely for that purpose; and was put to that very use by the litigant.

That makes it a "privileged publication," a publication (written or oral) ". . . made . . . [i]n any . . . judicial

---

[3]Dr. Bernstein testified: "The attorney for the widow . . . called me and told me . . . that this particular individual had died and that Columbia Steel had denied its responsibility in the matter, and would I look over the documents which included the examination of the autopsy and medical opinions of several of the other doctors, and would I render an opinion on these clinical data which were submitted."

proceeding . . ." (Civ. Code, § 47.) In such a case, the privilege is absolute. (*Moore* v. *United States Fid. & Guar. Co.*, 122 Cal.App. 205, 210-211 [9 P.2d 562], hearing by Supreme Court denied,—the filing, in a judicial proceeding, of a complaint containing a libelous statement. See also *Albertson* v. *Raboff*,* (Cal.) 287 P.2d 145.) ▮ The use of this report as evidence before the Industrial Accident Commission characterizes the author of it as a witness. The testimony of a witness in a judicial proceeding is uniformly accorded the same degree of privilege as is accorded the pleadings therein. (See cases collected in 12 A.L.R. 1247.)

▮ Thus, it is established in this state that statements made in an affidavit (testimony in written form) filed in a judicial proceeding enjoy this privilege. (*Donnell* v. *Linforth*, 11 Cal.App.2d 25, 28-29 [52 P.2d 937]; hearing by the Supreme Court denied. See also *Kelly* v. *Daro*, 47 Cal.App.2d 418 [118 P.2d 37], oral testimony in a legislative proceeding, which the statute puts in the same category as a judicial proceeding.)

The policy of making such statements privileged is obvious. If parties and witnesses were subject to slander and libel actions for utterances made or filed in a judicial proceeding the administration of justice would be hampered and the judicial process throttled. The same policy should ban a medical association by-law which holds over each of the members the threat of expulsion if in his testimony (oral or written) before a court or other judicial body he "disparages, by comment or insinuation,"[4] another physician. With such a threat ever facing him, he must weigh carefully and well his every utterance lest through some slip of the tongue he "insinuate" something about another physician which his county medical council may, perchance, deem "disparaging" and, as such, just cause for censure, suspension, or expulsion. It is inconceivable that the law could tolerate the holding of such a sword of Damocles over any medical witness in any judicial proceeding.[5]

---

*A rehearing was granted on September 28, 1955. The final opinion is reported in 46 Cal.2d —— [295 P.2d 405].

[4]The words quoted are the very words of section 4, art. IV, ch. III, Principles of Medical Ethics, American Medical Association; by no means limited to the proscribing of slanderous or libelous statements.

[5]It has been held that an association's by-laws are not enforceable if against public policy. (*Bennett* v. *Modern Woodmen*, 52 Cal.App. 581, 584-585 [199 P. 343], hearing by Supreme Court denied; cited with approval in *Ginsberg* v. *Butler*, 217 Cal. 467, 472 [19 P.2d 790, 92 A.L.R.

We are loath to read into the Principles of Medical Ethics an intent upon the part of the American Medical Association to interfere with the judicial process. We find it unnecessary to do so. The canon here involved contains not a single word about the duty of one physician toward another when testifying as a witness in a judicial proceeding. It is a fair inference from such silence that the American Medical Association when it formulated its Principles of Medical Ethics harbored no intent to arrogate to itself the state's prerogative of defining the duties of witnesses in judicial proceedings and the prescribing of penalties for the violation of such duties.

Moreover, section 4 speaks of a physician who "succeeds" another physician "in charge of a case." He is not to disparage the physician who "preceded" him in charge of the case, for such conduct tends to lower the confidence of the "patient" in the medical profession and reacts against the "patient," the profession and the critic. This suggests a doctor-patient relationship and one doctor succeeding another in that relationship.[6] It is difficult to fit the actors in the present drama into such a picture. It is hard to visualize the coroner or the widow or the body of the decedent as a patient in charge, first, of Dr. Ellis and, later, of Dr. Bernstein.

There is no escape from the conclusion that the evidence does not show a violation of section 4 in the Hill case.[7]

906]; followed in *McCormick* v. *Woodmen of the World*, 57 Cal.App. 568 [207 P. 943], hearing by Supreme Court denied.)

A by-law which provided for expulsion of a member upon his exercising his right to petition the Legislature was held invalid in *Spayd* v. *Ringing Rock Lodge No. 665*, 270 Pa. 67 [113 A. 70, 14 A.L.R. 1443].

Concerning the right of an association to expel or otherwise discipline a member for exercising a right or performing a duty as a citizen, see cases collected in 14 A.L.R. 1446-1450.

It has been held incompetent for an association to expel a member for testifying in a legal proceeding to the disadvantage of the association. (*St. Louis S. W. Ry. Co.* v. *Thompson*, 102 Tex. 89 [113 S.W. 144, 147, 19 Ann.Cas. 1250]; on later appeal, see (Tex.Civ.App.) 192 S.W. 1095.)

[6]Respondent suggests that this is too narrow a view, that it would render section 4 inapplicable to the specialist (such as a pathologist, a roentgenologist, or a surgeon) who is called in for consultation or treatment.

We are not persuaded that any such consequences would follow. Besides, no such situation is involved here. It will be time enough to decide such questions when they arise.

[7]The respondent association invokes section 1 of chap. XIII, By-Laws of California Medical Association, which declares that "Interpretation of ethics about which any controversy may arise or exist shall be submitted to the Council of this Association, and its interpretation thereon shall be final."

That interpretation must be reasonable.

The provisions of the constitution and by-laws become the contract

## THE MUIR CASE

■ The charge was that Dr. Bernstein violated section 1[8] of Article IV of Chapter III of the Principles of Medical Ethics in that "on March 10, 1951, Mrs. Leo F. Muir was a patient of Dr. M. L. Lipton, and was in Pittsburg Community Hospital for delivery of her second child. It was decided that a Caesarean section was necessary and the patient was moved from the labor room to surgery. Just prior to this removal, Dr. Bernstein was scrubbing for a delivery and he engaged a nurse in conversation within hearing distance of Mr. and Mrs. Muir. Dr. Bernstein commented to the nurse, and the comment was heard by Mr. and Mrs. Muir, that this was the poorest excuse for a section that he had ever seen and that 'if she (Mrs. Muir) pushed one through, she can push another through.' "

The trial court found the evidence sufficient to sustain a finding that this charge constituted an intentional violation of said section 1. Our examination of the record convinces us that the court's finding is correct and cannot be disturbed.

Appellant claims that the remarks which he made to the nurse were not intended for the ears of Dr. Lipton's patient or her husband and that he was unaware that they did hear

---

between an association and its members, limiting the power to regulate the conduct of the members.

"The *practical and reasonable* construction of the constitution and by-laws of a voluntary organization by its governing board is binding on the membership and will be recognized by the courts." (*DeMille* v. *American Fed. of Radio Artists*, 31 Cal.2d 139, 147 [187 P.2d 769, 175 A.L.R. 382]; emphasis added.).

An interpretation which is not reasonable is "not binding on the members . . . and will not be recognized by the courts." (*Mandracio* v. *Bartenders Union, Local 41*, 41 Cal.2d 81, 85 [256 P.2d 927], citing the DeMille case, and *Riviello* v. *Journeymen Barbers etc. Union*, 109 Cal. App.2d 123, 126-129 [240 P.2d 361].)

In *Smetherham* v. *Laundry Workers' Union*, 44 Cal.App.2d 131, 136-138 [111 P.2d 948], the court entertained no hesitancy in undertaking an interpretation of the by-laws, guided in part by these considerations: "Where one construction would make the contract unusual or extraordinary, courts are to disregard such construction if the contract may reasonably be subject to a construction which is fair and just. Indeed. it must be presumed that the parties intended the contract to be reason ably construed." (P. 138.)

[8]Section 1 reads as follows:

"A physician, in his relationship with a patient who is under the care of another physician, should not give hints relative to the nature and treatment of the patient's disorder; nor should a physician do anything to diminish the trust reposed by the patient in his own physician. In embarrassing situations, or whenever there seems to be a possibility of misunderstanding with a colleague, a physician should seek a personal interview with his fellow."

what he said. However, as stated orally by the trial court "the councilors could have made an implied finding that what the doctor said was intended to be overheard." There was evidence that the doctor was only 12 feet distant from the patient and her husband and that the door between them was open. Although the nurse testified that this conversation was carried on in a normal tone of voice and she did not know whether anybody else heard it, she also said she did know that they could have heard it if they had been listening and was afraid at the time that they had heard. Later, in a letter to the chairman of the Ethics Committee of the respondent association Dr. Bernstein exhibited considerable animus toward Dr. Lipton. Of this the trial court said "I think the petitioner's attitude toward the doctor [Lipton] as expressed in that letter strongly corroborates the intention here, and he may have intended by the remarks for the patient to hear and to disparage Dr. Lipton." Appellant claims his letter was admitted for a limited purpose which did not embrace the use made of it by the trial court. That is not correct. After its introduction and just prior to the conclusion of the accusers' case in chief, the referee, asked by appellant's counsel for clarification as to the parts admitted, ruled that the portion thereof which dealt with "a pharmacy fabrication" (not involved upon this appeal) would not be considered, but that "so far as the balance of the letter, as I heard it, I think it is all material. With that admonition to the Council, I think there is adequate safeguard for the admission of it."

The patient testified that she was terribly disturbed by Dr. Bernstein's remarks and momentarily lost confidence in her doctor and thought of consulting another doctor but after considering it regained her confidence in Dr. Lipton, who had already consulted two doctors before recommending a Caesarean.

It is clear that the charge and the evidence supporting it present facts which come well within the purview of the canon in question. This canon in its application to the circumstances of the Muir case is neither unreasonable nor against public policy and we find no basis for a reviewing court to disturb the trial court's ruling in respect to this charge.

## The Enea Case

The charge was that Dr. Bernstein violated section 1[9] of article IV of chapter III of the Principles of Medical

[9]The text of section 1 appears in a footnote on page 248, above.

Ethics in that "in the latter part of March, or early April, 1950, Mrs. Sarah A. Enea was under the care of Dr. S. S. Steinbergh for treatment of a fractured hip. After surgery was scheduled for this condition, Dr. Bernstein stated to Mrs. Enea's brother that Mrs. Enea should not be operated upon for this condition. On May 12, 1950, Mrs. Enea was again operated upon for the fractured hip condition. At that time, Dr. Bernstein told Mrs. Enea's brother that they should call in a consultant and that they should have done this initially as he suggested."

The second incident is supported in part by the testimony of the patient, Mrs. Enea, in the form of a written statement by her.[10] It is not too clear whether in making this statement she was referring to the first or second incident of the charge. We were inclined to view it as a reference to the first incident, but appellant insists that she was speaking of the second incident and he has convinced us that such was the case, particularly in view of the words "who stated that I should not have been operated upon" which appear near the end of the first sentence of her statement. (That leaves the first incident of the charge unsupported by sufficient evidence but the proof concerning the second incident is sufficient, and that in turn is sufficient to affirm the trial court.) Dr. Bernstein now objects to the hearsay portion of this statement. He says that hearsay cannot serve as the sole basis for a finding of fact.

■ It appears to us that he is not in a position to urge this objection in view of the circumstances under which Mrs. Enea's statement went into evidence. The referee had already ruled out as hearsay a question addressed to the witness Dr. Steinbergh asking him to tell what Mrs. Enea's husband told him that Dr. Bernstein said to Mrs. Enea's brother. The accusers were now offering this statement signed by Mrs. Enea, explaining that she refused to come to the hearing and testify. His counsel then suggested that he and opposing

---

[10]Her statement reads as follows:

"On March 27, 1950, I slipped in the backyard and broke my left hip. At that time I was due to deliver my first child within two weeks. Dr. C. L. Kerns was my obstetrician and he called Dr. S. S. Steinbergh in as consultant to treat the fractured hip. After surgery was scheduled, my brother Frank (Aiello) was approached by Dr. S. L. Bernstein who stated that I should not have been operated upon, for this condition. My brother, in turn, passed this on to my husband and we discussed it the night before operation and both agreed that we wanted Dr. Steinbergh to proceed with surgery."

counsel "get together during some future recess and . . . eliminate the hearsay and opinion. I would be perfectly satisfied to have the balance of the statement read in the record. I don't think the record should be cluttered up with a lot of hearsay and opinion."

Such a conference was held. Counsel agreed upon elimination of the second paragraph of the statement and stipulated that the first paragraph go into evidence.[11] To stipulate it into evidence under the circumstances described would seem in effect a stipulation that this piece of hearsay be treated as fully competent for all purposes and thus would be eligible to serve as the sole proof of what Dr. Bernstein said upon that occasion. It would seem inequitable to permit him now to object that this bit of hearsay was not buttressed by more direct evidence.

In making this analysis of this evidence we are not holding that in a hearing of this nature hearsay might not furnish a sufficient basis for the finding of a material fact. The by-laws of the California Medical Association govern the conduct of such hearings and provide that they shall be conducted "in such manner as to ascertain all the facts fairly to the accuser and accused, eliminating all formal or technical rules and requirements which ordinarily pertain to judicial proceedings." Such a rule well may sanction the use of relevant hearsay to support a finding, (see *Sada* v. *Industrial Acc. Com.*, 11 Cal.2d 263, 268-269 [78 P.2d 1127]) a question which we need not determine in view of the circumstances under which the presently questioned hearsay was put in evidence.

Dr. Bernstein testified that one of his own patients (Frank Aiello, a brother of Mrs. Enea) came to him, told him the nail which had been inserted during the first operation had slipped and asked "What do you think about it?" and the doctor replied it would probably be a good idea to get another opinion. Asked whom he would suggest, he suggested getting a Dr. Fisher but to do so through Dr. Steinbergh. He argues

---

[11]In this connection his counsel stated: "So the record will be . . . clear in the matter, we will stipulate of course if Mrs.Enea was personally present and testifying in this proceeding, that her testimony with respect to these matters that you have read [the referee had just read the first paragraph into the record and had refused introduction of the second paragraph] would have been exactly as you read the statement," but that "we don't stipulate of course, as to the truth of those matters."

The referee confirmed, saying: "That is right, it is evidence on behalf of the Accuser's case. . . . That is evidence and may be considered by the Council as part of the record in the case on behalf of the Accusers."

that such a response, to one of his own patients, characterizes it as a communication which is not proscribed by the canon of ethics specified in the charge. He thereby overlooks Mrs. Enea's testimony that Dr. Bernstein said that she "should not have been operated upon, for this condition."

The trial court considered this point and rejected it. In doing so, the court referred to the bitter feeling toward Dr. Steinbergh which Dr. Bernstein displayed in emphatic terms in a letter which he later wrote to the Ethics Committee of the medical association in regard to this and other incidents. In this connection the court said: ". . . the language he used about Dr. Steinbergh in his letter to the Ethics Committee, very frankly I just don't think the Court can feel that he acted in good faith. I think the only sustainable finding is that Dr. Bernstein intended to injure and disparage Dr. Steinbergh." However we might have interpreted the canon involved, in its application to the facts of the Enea case, had we that interpretation to make in the first instance, it comes to us upon appeal after having been made pursuant to appellant's agreement to be bound by the interpretation made by his state council. That interpretation has in turn been confirmed by the trial court and we are unable to say that it is unreasonable or against public policy.

We conclude that there is no basis for a reviewing court to disturb the trial court's finding that "the evidence was sufficient to sustain a finding that Charge 5 [the Enea case] constituted an intentional violation of Section 1, Article 4, of Chapter III of the Principles of Medical Ethics."

### REDETERMINATION OF PENALTY

The determination of the penalty (censure, suspension, or expulsion) for violation of the Principles of Medical Ethics is vested in the trial council, subject to appropriate review, of course.

Here the trial council imposed a single penalty, that of expulsion, for all seven violations, not a separate penalty for any one of them, nor a separate penalty for any group of them less than seven.

The seven violations have now been reduced to two. We have no way of knowing whether the trial council would have meted out the same penalty if it had found these two violations only. When such a situation develops upon the review of a disciplinary order of a public administrative agency, the agency is directed to set aside the order and

redetermine the penalty. (*Bonham* v. *McConnell,* 45 Cal.2d 304, and cases cited on p. 306 [288 P.2d 502].) We deem that principle applicable here. (See *Cason* v. *Glass Bottle Blowers Assn.*, 37 Cal.2d 134, 147 [231 P.2d 6], remanding the matter of reinstatement or retrial "to the union for further proceedings in accordance with the rules which we have discussed.")

In view of this conclusion it is unnecessary to consider appellant's claim that the penalty of expulsion was excessive, arbitrary, in abuse of discretion and based in part upon charges which the trial council found were not sustained.

## Is This a Justiciable Controversy?

The respondent association advances the argument that "membership in a professional nonprofit association such as respondent in which the members have no severable interest in the property of the association, is not the subject of judicial intervention as there is no property right involved."

■ That is an inadequate and inaccurate statement of the applicable principles which have been succinctly expressed by the Supreme Court in these words: "In any proper case involving the expulsion of a member from a voluntary unincorporated association, the only function which the courts may perform is to determine whether the association has acted within its powers in good faith, in accordance with its laws and the law of the land." (*Smith* v. *Kern County Medical Assn.*, 19 Cal.2d 263, 265 [120 P.2d 874].) In making that statement the Supreme Court cited *Levy* v. *Magnolia Lodge, I.O.O.F.*, 110 Cal. 297 [42 P. 887], and *Smetherham* v. *Laundry Workers' Union*, 44 Cal.App.2d 131 [111 P.2d 948]. The very act of citing these two cases carries an implied suggestion that in relation to this subject there is no fundamental distinction between a medical association, a labor union and a fraternal or beneficial association. In each type of organization the relationship between the members and the group is determined by contract, the terms of which find expression in the constitution and by-laws. "Any matter of policy involved in the adoption of the by-laws, the code of ethics, and the resolution in conformity therewith, is a question for the membership itself and is not debatable here so long as it is not shown that such policy is in violation of law." (Pp. 270-271 of 19 Cal.2d.)

Other forms of expressing this same principle will be found in *Swital* v. *Real Estate Comr.*, 116 Cal.App.2d 677, 679 [254

P.2d 587], concerning membership upon a realty board, and in *Miller* v. *International Union etc. Engineers,* 118 Cal. App.2d 66, 68 [257 P.2d 85], relating to membership in a labor union.

We entertain no doubt that the issues discussed herein are justiciable and that mandamus affords an appropriate proceeding for their judicial consideration and determination.

Somewhat inconsistently with its contention that this is not a justiciable controversy respondent upon this appeal asks that in the case in which the state council overruled the trial council and in two of the cases in which the trial court annulled the findings of the trial council, the findings of the latter should be revived, restored and given legal effect. The respondent is in no position to make any such claim. It did not appeal from the state council's decision nor did it petition the trial court nor has it appealed from the trial court's decision.

The judgment is reversed with directions to the trial court to revise the findings of fact and conclusions of law and render judgment, all in accordance with the views herein expressed, the judgment to include a direction to the trial council to set aside its order of expulsion and to determine the penalty to be imposed in the light of the revised findings herein.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied March 16, 1956, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied April 11, 1956.