[No. C015589. Third Dist. Apr. 28, 1994.]

HOWARD BUDWIN, Plaintiff and Respondent, v.
AMERICAN PSYCHOLOGICAL ASSOCIATION, Defendant and
Appellant.

**COUNSEL**

Jenner & Block, David W. Ogden, Kit A. Pierson, Farella, Braun & Martel, Douglas R. Young and Adam C. Dawson for Defendant and Appellant.

Stephen A. Holmes for Plaintiff and Respondent.

**OPINION**

**DAVIS, J.**—The principal issue in this appeal is whether a private, voluntary association of psychologists is prohibited under the litigation privilege of Civil Code section 47, subdivision (b), or the doctrine of "quasi-judicial immunity," from censuring one of its members for presenting false statements as a court-appointed expert in a child custody proceeding. We conclude the association is not prohibited from imposing such discipline. Accordingly, we reverse the summary judgment in favor of the psychologist.

## BACKGROUND

Pursuant to California Evidence Code section 730, Dr. Howard Budwin, a licensed psychologist, was appointed by the Sacramento Superior Court to serve as a neutral expert in a 1987 child custody proceeding. In that proceeding, Dr. Budwin submitted a written report and testified regarding his custody recommendation. The court followed that recommendation, which was to separate the two children involved—with the mother retaining custody of the older daughter but relinquishing custody of the younger one.

The mother in the custody proceeding, Margaret Jahn, filed a complaint against Dr. Budwin with the state Board of Medical Quality Assurance. While that complaint was being investigated, Ms. Jahn filed a similar complaint with the American Psychological Association (APA), the appellant here. These complaints alleged, among other things, that Dr. Budwin made false statements in the custody proceeding (about conducting one-hour interactive "play" interviews between Ms. Jahn and each daughter when in fact he had not done so) and withheld certain documents from Ms. Jahn and her attorney.

The Board of Medical Quality Assurance denied Ms. Jahn's complaint, finding no violation of the California Business and Professions Code/Medical Practice Act.

The APA sustained Ms. Jahn's complaint, finding that Dr. Budwin violated certain principles embodied in its "Ethical Principles of Psychologists" by failing to honor his commitment to produce records and by failing to address the limits of his interaction and observations in both his court report and testimony. Based on these findings, as well as others, the APA censured Dr. Budwin. An APA member who is censured like Dr. Budwin retains all the rights and privileges of APA membership, but may be required, as was Dr. Budwin, to complete further training or other appropriate steps.

The APA is a private, voluntary, national association of psychologists. The association requires its members to be subject to its published "Ethical Principles of Psychologists" and its published "Rules and Procedures" for enforcing those principles.

In November 1991, Dr. Budwin filed a petition for writ of mandate. He sought to overturn the APA's censure, claiming that his conduct, his report to the court, and his testimony in the Jahn custody proceeding were protected both by the litigation privilege for communications made in judicial proceedings (Civ. Code, § 47, subd. (b)) and by the doctrine of quasi-judicial

immunity. Dr. Budwin also alleged that the APA violated rules of fair procedure and its own bylaws and procedural rules in censuring him.

In early 1993, Dr. Budwin moved successfully for summary judgment. Solely for purposes of ruling in the summary judgment context, the trial court assumed that the APA was correct that Dr. Budwin knowingly testified falsely in the Jahn custody proceeding. The court ruled that such testimony is privileged under California law from disciplinary action by a private association. This appeal by the APA then ensued.

## DISCUSSION

### 1. *Judicial Review*

At the outset, we must consider the APA's point that its censure of Dr. Budwin is not even judicially reviewable since it involves a nonpublic censure by a private association that did not result in any economic injury or loss of tangible membership rights. As we explain, the APA's argument goes astray in focusing on Dr. Budwin's deprivations rather than on the public policy issues implicated in this case.

Out of respect for a private association's autonomy and special competence, courts generally will not interfere with the internal affairs of such an organization or with the enforcement of its rules unless the determination of some civil or property right is involved. (See *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 557-558 [116 Cal.Rptr. 245, 526 P.2d 253] [*Pinsker*]; 7 Cal.Jur.3d, Associations and Clubs, § 36, pp. 172-174.) "It is true that courts will not interfere with the disciplining or expelling of members of such associations where the action is taken in good faith and in accordance with its adopted laws and rules. But if the decision of the tribunal is contrary to its laws or rules, or it is not authorized by the by-laws of the association, a court may review the ruling of the board and direct the reinstatement of the member." (*Smetherham* v. *Laundry Workers' Union* (1941) 44 Cal.App.2d 131, 135-136 [111 P.2d 948].) When a voluntary association disciplines one of its members, ". . . the only function which the courts may perform is to determine whether the association has acted within its powers in good faith, in accordance with its laws and the law of the land." (*Smith* v. *Kern County Medical Assn.* (1942) 19 Cal.2d 263, 265 [120 P.2d 874].)

Emanating from this "law of the land" proviso, however, is the principle that a court will prohibit a private, voluntary association from enforcing a rule which is contrary to established public policy. (*Pinsker, supra,* 12

Cal.3d at pp. 553, 558; *California State University, Hayward* v. *National Collegiate Athletic Assn.* (1975) 47 Cal.App.3d 533, 539-540 [121 Cal.Rptr. 85]; *Washburn* v. *City of Berkeley* (1987) 195 Cal.App.3d 578, 587 [240 Cal.Rptr. 784]; *Bernstein* v. *Alameda etc. Med. Assn.* (1956) 139 Cal.App.2d 241, 253 [293 P.2d 862].) The essence of Dr. Budwin's successful motion for summary judgment, and thus the appeal here, is that the APA's censure of him violated the public policies established both by the litigation privilege of Civil Code section 47, subdivision (b) (hereafter, section 47(b)), and by the doctrine of quasi-judicial immunity. This focus poses questions of law that a court has the power to decide. (*Ibid.*)[1] We now turn to those questions.

## 2. *Section 47(b)*

■     Section 47(b) states in pertinent part: "A privileged publication or broadcast is one made: [¶] . . . In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law . . . ." The "judicial proceeding" strand of this statutory privilege, known as the "litigation privilege," protects attorneys, judges, jurors, witnesses, and other court personnel from liability arising from communications made during a judicial proceeding. (*Mattco Forge, Inc.* v. *Arthur Young & Co.* (1992) 5 Cal.App.4th 392, 402 [6 Cal.Rptr.2d 781]; *Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 215 [266 Cal.Rptr. 638, 786 P.2d 365] [*Silberg*]; see also *Howard* v. *Drapkin* (1990) 222 Cal.App.3d 843, 860-864 [271 Cal.Rptr. 893] and *Gootee* v. *Lightner* (1990) 224 Cal.App.3d 587, 591-596 [274 Cal.Rptr. 697] [the litigation privilege protects consulting psychologists retained or appointed to make recommendations in child custody proceedings].) The litigation privilege furthers several public policies. The principal one is ensuring free access to the courts by prohibiting derivative tort actions. (*Silberg, supra,* at pp. 213-214.) The privilege also promotes complete and truthful testimony, encourages zealous advocacy, gives finality to judgments, and avoids unending litigation. (*Id.* at p. 214.)

"In furtherance of the public policy purposes it is designed to serve, the privilege prescribed by section 47(2) [section 47(2) later became 47(b)] has been given broad application. Although originally enacted with reference to defamation [citation], the privilege is now held applicable to any communication, whether or not it amounts to a publication [citations], and all torts except malicious prosecution. . . . [¶] The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to

---

[1]In any event, Dr. Budwin was placed on inactive status as a Sacramento Superior Court forensic psychologist based on the APA's censure, and California courts can, in appropriate circumstances, review a private professional association's censure of one of its members. (See *Salkin* v. *California Dental Assn.* (1986) 176 Cal.App.3d 1118 [224 Cal.Rptr. 352].)

achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg, supra,* 50 Cal.3d at pp. 211-212.)

*Silberg* focused on section 47(b)'s protection from tort liability. (50 Cal.3d at pp. 211-216, 218-219.) Other courts have characterized the protection in blunter fashion. For example, in *Mattco Forge, Inc.* v. *Arthur Young & Co., supra,* 5 Cal.App.4th 392, the court stated flatly: "The privilege applies only to tort causes of action . . . ."[2] (*Id.* at p. 406; see also *Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1168 [232 Cal.Rptr. 567, 728 P.2d 1202]; *Washburn* v. *City of Berkeley, supra,* 195 Cal.App.3d at p. 586; *ITT Telecom Products Corp.* v. *Dooley* (1989) 214 Cal.App.3d 307 [262 Cal.Rptr. 773].)

Whatever the reach of section 47(b), it has not been extended to preclude professional disciplinary liability. (See *Silberg, supra,* 50 Cal.3d at pp. 218-219 [recognizing that § 47(b) bars tort actions, but that "other remedies . . . exist" to help deter injurious communications during litigation, including State Bar disciplinary proceedings]; *Doctors' Co. Ins. Services* v. *Superior Court* (1990) 225 Cal.App.3d 1284, 1294 [275 Cal.Rptr. 674] [same]; *O'Neill* v. *Cunningham* (1981) 118 Cal.App.3d 466, 476 [173 Cal.Rptr. 422] [same]; *Izzi* v. *Rellas* (1980) 104 Cal.App.3d 254, 264 [163 Cal.Rptr. 689] [same]; *Umansky* v. *Urquhart* (1978) 84 Cal.App.3d 368, 373 [148 Cal.Rptr. 547] [same]; *Friedman* v. *Knecht* (1967) 248 Cal.App.2d 455, 462 [56 Cal.Rptr. 540] [same].)[3]

In a decision that discussed a similar privilege regarding prosecutorial immunity, the United States Supreme Court recognized the distinctive nature of disciplinary liability: "We emphasize that the immunity of prosecutors from liability . . . does not leave the public powerless to deter misconduct or to punish that which occurs . . . . [A] prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers." (*Imbler* v. *Pachtman* (1976) 424 U.S. 409, 428-429 [47 L.Ed.2d 128, 142-143, 96 S.Ct. 984].) Interestingly, this recognition cited discipline by a voluntary, professional association (the American Bar Association) analogous to the APA here. (*Id.* at p. 429, fn. 30 [47 L.Ed.2d at p. 143].)

██ Dr. Budwin relies heavily on *Bernstein* v. *Alameda etc. Med. Assn., supra,* 139 Cal.App.2d 241. In that case, Dr. Bernstein challenged his

---

[2]In so stating the court noted the privilege does not apply to every tort; it is inapplicable to the tort of malicious prosecution. (*Mattco Forge, Inc.* v. *Arthur Young & Co., supra,* 5 Cal.App.4th at p. 406; see also *Silberg, supra,* 50 Cal.3d at p. 216.)

[3]Of course, section 47(b) does not preclude criminal liability such as perjury. (*Silberg, supra,* 50 Cal.3d at p. 219.)

expulsion from a county medical association for violating the following ethical rule of the American Medical Association: " 'When a physician does succeed another physician in charge of a case, he should not disparage, by comment or insinuation, the one who preceded him. Such comment or insinuation tends to lower the confidence of the patient in the medical profession and so reacts against the patient, the profession and the critic.' " (*Id.* at p. 244, fn. 2.) Dr. Bernstein had prepared a report for use in an industrial accident proceeding where the issue was whether the deceased employee's death was workrelated. Dr. Bernstein had concluded it was. In so doing, he criticized another doctor who had concluded it probably was not. (*Id.* at pp. 244-246.)

The *Bernstein* court refused to enforce the ethical rule at issue, finding it contravened the public policy set forth in section 47(b). The court explained: "The . . . policy [underlying section 47(b)] should ban a medical association by-law which holds over each of the members the threat of expulsion if in his testimony (oral or written) before a court or other judicial body he 'disparages, by comment or insinuation,' another physician. With such a threat ever facing him, he must weigh carefully and well his every utterance lest through some slip of the tongue he 'insinuate' something about another physician which his county medical council may, perchance, deem 'disparaging' and, as such, just cause for censure, suspension, or expulsion. It is inconceivable that the law could tolerate the holding of such a sword of Damocles over any medical witness in any judicial proceeding." (139 Cal.App.2d at p. 246, fn. omitted.) In a footnote, the court also noted that the phrase "disparages, by comment or insinuation" were the "very words" of the ethical rule at issue and that this rule was "by no means limited to the proscribing of slanderous or libelous statements." (*Id.* at p. 246, fn. 4.)

There is no sword of Damocles perched precariously above Dr. Budwin's head in this case. The APA found he made representations to the court knowing that they were false or knowing that he lacked sufficient information to warrant them. This case does not encompass the subjective, amorphous and risky context of one doctor "disparaging" by "insinuation" his predecessor on a case.

Furthermore, as the *Bernstein* court noted implicitly, the ethical rule at issue there prohibited *any* criticism of the preceding doctor, even if it were truthful and made in good faith. (139 Cal.App.2d at p. 246, fn. 4.) The *Bernstein* court focused on the width of this ethical broad brush, and concluded that its application to disparaging statements made in the course of legal proceedings violated the public policy articulated in section 47(b).

(*Id.* at pp. 246-247.)[4] The court did not hold that section 47(b) precludes a voluntary, professional association from disciplining a member for misrepresentations made in the course of an official proceeding; no California court in the nearly 40 years of *Bernstein*'s existence has read the decision that way. (See *Pinsker, supra,* 12 Cal.3d at p. 553; *Curran v. Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712, 721 [195 Cal.Rptr. 325, 38 A.L.R.4th 607]; *Washburn v. City of Berkeley, supra,* 195 Cal.App.3d at p. 587.)

In view of the clear line drawn in the "litigation privilege" decisions between tort liability on the one hand and criminal and disciplinary liability on the other (*Bernstein*'s unique facts notwithstanding), Dr. Budwin concedes the state can discipline him through its regulatory oversight of psychologists. (See Bus. & Prof. Code, § 2900 et seq.) But he uses this public sword as his private shield to argue that he is protected from any discipline, *except* from the state. In short, he claims the state has preempted the disciplinary field, leaving no room for discipline by professional, voluntary associations. Not surprisingly, Dr. Budwin cites no specific authority for this remarkable proposition; a proposition, we might add, that would affect significantly the autonomy of such associations. (See *Pinsker, supra,* 12 Cal.3d at pp. 557-558.)

■ Subject to the scope of judicial review noted in the previous section of this opinion, a voluntary association has the power to adopt the regulations that its membership sees fit. (*Smith v. Kern County Medical Assn., supra,* 19 Cal.2d at pp. 270-271.) Subject to this limited judicial oversight, the association's constitution and bylaws give it the power to regulate the conduct of its members and those provisions are the measure of its authority to discipline, suspend or expel. (*Smetherham v. Laundry Workers' Union, supra,* 44 Cal.App.2d at pp. 136-137.) This disciplinary power is not barred by the possibility of governmental prosecution. (*Smith, supra,* 19 Cal.2d at pp. 269-271.) Judicial authorities have made it clear that a perfectly legitimate objective of professional associations is to attempt to elevate professional standards established by the government. (*Pinsker, supra,* 12 Cal.3d at p. 560.)

■ In the context of the false representations assumed to exist in this case for summary judgment purposes, we conclude a private, voluntary,

---

[4]It was in this broad context that the court in *Bernstein* said it was "loath to read into the Principles of Medical Ethics an intent upon the part of the American Medical Association to interfere with the judicial process . . . [and] to arrogate to itself the state's prerogative of defining the duties of witnesses in judicial proceedings and the prescribing of penalties for the violation of such duties." (139 Cal.App.2d at p. 247.)

professional association is not precluded by the litigation privilege of section 47(b) from disciplining one of its members for making such representations in a judicial proceeding.[5]

### 3. *Quasi-Judicial Immunity*

■ "The concept of judicial immunity is long-standing and absolute, with its roots in English common law. It bars civil actions against judges for acts performed in the exercise of their judicial functions and it applies to all judicial determinations, including those rendered in excess of the judge's jurisdiction, no matter how erroneous or even malicious or corrupt they may be. . . . [¶] Under the concept of 'quasi-judicial immunity,' California courts have extended absolute judicial immunity to persons other than judges if those persons act in a judicial or quasi-judicial capacity." (*Howard* v. *Drapkin, supra*, 222 Cal.App.3d at pp. 851-853 [*Howard*], fn. omitted.) The concept of quasi-judicial immunity has been extended to neutral third parties, including court-appointed psychologists in child custody proceedings, "for their conduct in performing dispute resolution services which are connected to the judicial process and involve either (1) the making of binding decisions, (2) the making of findings or recommendations to the court, or (3) the arbitration, mediation, conciliation, evaluation or other similar resolution of pending disputes." (*Id.* at p. 860.)

■ Quasi-judicial immunity and the litigation privilege are not coextensive. (*Howard, supra*, 222 Cal.App.3d at p. 850, fn. 2 [unlike quasi-judicial immunity, the litigation privilege is limited to "communicative acts"].) But like the litigation privilege, the reach of quasi-judicial immunity does not encompass disciplinary liability by a private, voluntary association. The decisions speak only in terms of protection from "civil actions," "civil suits," "damage claims" (*Howard, supra*, 222 Cal.App.3d at pp. 851, 853, 857), "civil liability" (*White* v. *Towers* (1951) 37 Cal.2d 727, 730 [235 P.2d 209, 28 A.L.R.2d 636]), "subsequent suit" (*Mattco Forge, Inc.* v. *Arthur Young & Co., supra*, 5 Cal.App.4th at p. 403), or "civil liability for various tort claims" (*Gootee* v. *Lightner, supra*, 224 Cal.App.3d at p. 590, fn. 2

---

[5]In this decision, we have not determined whether the APA acted in good faith, whether it employed a fair procedure, or whether it acted in accordance with its own laws. (See *Smetherham* v. *Laundry Workers' Union, supra*, 44 Cal.App.2d at pp. 135-136; *Smith* v. *Kern County Medical Assn., supra*, 19 Cal.2d at p. 265; *California State University, Hayward* v. *National Collegiate Athletic Assn., supra*, 47 Cal.App.3d at pp. 539-540.) Nor have we determined, with respect to the merits of the charges which resulted in Dr. Budwin's discipline, "whether there was any evidence whatever before the [APA] to support its conclusion." (See *McConville* v. *Milk W.D. Union* (1930) 106 Cal.App. 696, 697-698 [289 P. 852]; *Zurn Engineers* v. *State of California* ex rel. *Dept. Water Resources* (1977) 69 Cal.App.3d 798, 836-837 [138 Cal.Rptr. 478]; see also *Smetherham, supra*, at p. 135.)

[characterizing *Howard*]). (See also *Imbler* v. *Pachtman*, *supra*, 424 U.S. at p. 429 [47 L.Ed.2d at p. 143] [explaining that despite the "absolute" immunity granted prosecutors, they remain subject to "professional discipline by [a voluntary] association of [their] peers"]; and *Myers* v. *Morris* (8th Cir. 1987) 810 F.2d. 1437, 1467.) For this reason, we conclude the doctrine of quasi-judicial immunity does not bar the APA from disciplining Dr. Budwin for the false representations (noted previously) or the conduct (the wrongful refusal to produce documents) the APA claims he made or carried out. (See fn. 5, *ante*.)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court. The APA is awarded its costs on appeal.

Sims, Acting P. J., and Nicholson, J., concurred.