[No. B058047. Second Dist., Div. Three. Apr. 9, 1992.]

MATTCO FORGE, INC., et al., Plaintiffs and Appellants, v.
ARTHUR YOUNG & CO. et al., Defendants and Respondents.

## COUNSEL

O'Neill & Lysaght, J. Joseph Connolly and John M. Moscarino for Plaintiffs and Appellants.

Ernst & Young, Eugene R. Erbstoesser, Cameron D. Coy, Kathryn A. Oberly and Melanie T. Morris for Defendants and Respondents.

## OPINION

**HINZ, J.—**

### INTRODUCTION

The litigation privilege in Civil Code section 47, subdivision (b),[1] has at times seemed to protect virtually anyone participating in litigation from subsequent suit. Nevertheless, California precedent does not authorize, and the policies underlying the privilege do not support, its use to protect a negligent expert witness from liability to the party who hired that witness. We therefore conclude that the trial court erroneously relied upon the privilege in granting summary judgment in favor of the expert witness.

The case at bench arose out of litigation in federal district court between Mattco Forge, Inc. (Mattco) and General Electric (General Electric). In that suit Mattco engaged Arthur Young & Co. (Arthur Young) to perform litigation support accounting work. After the dismissal of that underlying suit

---

[1] Unless otherwise specified statutes in this opinion will refer to the California Civil Code. Although the parties refer to section 47(2), this opinion will use the numbering as amended, section 47, subdivision (b).

against General Electric, the second amended complaint filed in the Los Angeles Superior Court by plaintiffs Mattco and Mateo Minguez named as defendants Arthur Young, Richard E. Lamping, Thomas W. Blumer, and Ernst & Young. Against one or more of each of these defendants, the second amended complaint alleged causes of action for professional malpractice, fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, tortious breach of the implied covenant of good faith and fair dealing, constructive trust, and fraudulent concealment.

Defendants moved for summary judgment on February 14, 1991. On March 28, 1991, the trial court filed a judgment dismissing the second amended complaint and entering judgment in favor of the defendants. Notice of entry of judgment was filed April 1, 1991. Plaintiffs filed a timely notice of appeal on April 23, 1991.

### STANDARD OF REVIEW ON SUMMARY JUDGMENT

As Code of Civil Procedure section 437c states, summary judgment shall be granted only if the papers submitted show no triable issue as to any material fact and entitle the moving party to a judgment as a matter of law. ▪ On appeal, this court limits its review to facts in documents presented to the trial court, and independently determines their effect as a matter of law. (*McDaniel* v. *Sunset Manor Co.* (1990) 220 Cal.App.3d 1, 5 [269 Cal.Rptr. 196].)

A drastic procedure, summary judgment denies the adverse party's right to a trial and should be used with caution. The moving party bears the burden of furnishing supporting documents showing the adverse party's claims lack merit on any legal theory. This court strictly construes evidence submitted by the moving party, and liberally construes the opposing party's evidence. Summary judgment law turns on issue finding rather than on issue determination. (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35-36 [210 Cal.Rptr. 762, 694 P.2d 1134].)

### FACTS

Defendants' motion argued that Mattco's unclean hands and the litigation privilege in section 47, subdivision (b) barred the complaint as a matter of law and entitled the defendants to summary judgment. As presented to the trial court in their motion, separate statement of material facts, and supporting papers, defendants alleged the following facts.

Mattco hired the defendants as damage consultant and expert witness on damages in Mattco's action against General Electric in federal district court.

To calculate Mattco's estimated lost profits, defendants needed complete information about Mattco's prior contracts with General Electric, but neither Mattco nor defendant Blumer could locate all the original General Electric job cost estimating sheets. Blumer asked Mattco for figures from the missing General Electric estimate sheets. Mattco recreated estimate sheets and gave them to Blumer and the defendants. Mattco informed Blumer the documents were recreated job cost estimate sheets for General Electric contracts that contained true recreated cost information.

The federal district court held that Mattco and Minguez created and produced fraudulent documents to General Electric, with an intent to deceive General Electric and the court and to inflate artificially Mattco's claimed damages. The federal court cited evidence indicating that Mattco had deliberately destroyed evidence to weaken General Electric's counterclaim for procurement fraud, and cited evidence indicating that Mattco lied to the court by submitting testimony that Mattco routinely discarded such evidence.

The federal district court ordered Mattco to pay General Electric $1.4 million in sanctions or have its case dismissed. Mattco did not appeal the federal court's ruling that Mattco had engaged in fraudulent conduct. The motion included the federal district court's orders for sanctions, containing factual findings.

In 1989, the Los Angeles Superior Court sustained demurrers to Mattco's original and first amended complaints due to Mattco's unclean hands in the underlying federal district court action. In 1990, the Los Angeles Superior Court denied defendants' demurrer to Mattco's second amended complaint because it felt constrained to the bounds of the pleadings. The court suggested that after conducting discovery, defendants should bring a motion going beyond the bounds of the pleadings. Plaintiffs and defendants conducted discovery, including depositions, inspection demands, interrogatories, and requests for admissions.

Plaintiffs responded to defendants' motion and separate statement, and filed a statement of additional undisputed facts and supporting evidence bearing upon the motion. Plaintiffs disputed defendants' statement that to calculate Mattco's estimated lost profits, defendants needed complete information regarding Mattco's prior contracts with General Electric. Plaintiffs responded that Arthur Young's promotional literature advertised itself as an organization that could assist attorneys and clients having a "real or apparent lack of data." Lamping described Mattco's recordkeeping as good compared to other small businesses. Mattco contended it was not necessary for Arthur

Young to have each original estimate sheet for each General Electric job, insofar as actual costs were available and could have been used in calculating lost profits.

Plaintiffs disputed defendants' statement that Blumer asked Mattco to give him the figures from the missing General Electric estimate sheets. Plaintiffs responded that Blumer asked Minguez to give him a "rough idea" or "best recollection" of how the job would have been estimated and to prepare noncontemporaneous estimating information. Blumer did not expect that he would receive exact replications of the missing estimate sheets.

Plaintiffs disputed defendants' statement that Mattco recreated estimate sheets and gave them to Blumer and Arthur Young, and that Mattco told Blumer the documents were recreated job cost estimate sheets for General Electric contracts that contained true recreated cost information. Plaintiffs responded that although Minguez prepared noncontemporaneous estimating information at Blumer's request, he did not intend to prepare it for use as evidence in the litigation against General Electric. Minguez did not know or have reason to know that such documents would be produced to General Electric. Minguez never told Blumer that documents containing noncontemporaneous estimating information contained "true" or accurate data. Blumer did not expect the information would be an exact replica of the missing estimate sheets.

Plaintiffs disputed defendants' statement that the federal district court held that plaintiffs created and produced fraudulent documents with an intent to deceive General Electric and the court and to inflate Mattco's claimed damages. Plaintiffs responded that this statement was irrelevant to any collateral estoppel argument. The federal district court instead held that Mattco was responsible for the conduct of its accountants and banished Arthur Young from further involvement in the case. Arthur Young never participated in the federal district court proceedings.

Plaintiffs disputed defendants' statement that Mattco had engaged in fraudulent conduct. Plaintiffs responded that this statement mischaracterized the ruling, but admitted they did not appeal the federal district court's order.

Plaintiffs' "Additional Statement of Undisputed Facts and Supporting Evidence" alleged the following facts. Arthur Young's petition for writ of mandate seeking to overturn the denial of demurrers to the second amended complaint was denied. Defendants' summary judgment motion does not controvert allegations in the second amended complaint, paragraphs 29 and 61, and testimony by Arthur Young employees substantiates those allegations.

Paragraph 29 alleged that when he prepared noncontemporaneous estimating information for Blumer, Minguez was trying to help Blumer determine costs. Minguez did not intend to prepare documents for production as evidence in the litigation against General Electric. Minguez did not know or have reason to know that the noncontemporaneous estimating information would be produced to General Electric as estimate sheets.

Paragraph 61 alleged that Arthur Young cannot rely on estoppel by judicial admissions to preclude plaintiffs from obtaining relief. Plaintiffs' attorneys represented to the federal district court that Arthur Young had not attempted to fabricate documents and did not rely on the noncontemporaneous estimating information in performing its analysis. Plaintiffs' attorneys relied on Arthur Young's representations to them, and served merely as a conduit for Arthur Young. It would be inequitable to permit Arthur Young to escape liability based on statements in federal district court pleadings made in reliance on, and at the insistence of, Arthur Young.

Plaintiffs alleged that in late 1985, Mattco retained Arthur Young as an expert witness to calculate and testify about the profits Mattco lost due to the conduct of General Electric. A September 4, 1985, engagement letter reflects the terms of their agreement, as follows. Arthur Young would assist and supervise Mattco in analyzing financial data needed to calculate Mattco's lost profits resulting from the loss of the General Electric contract. Arthur Young would assist Mattco in creating a pro forma statement of operations after the date Mattco ceased doing business with General Electric. Arthur Young would assist Mattco in gathering information on lost subcontract work resulting from not appearing on the General Electric bidder list. Arthur Young would assist Mattco in establishing capital improvements costs which had minimal value after the loss of the General Electric contract. Arthur Young would testify as expert witnesses during discovery and trial.

In November 1986, Blumer spent three days at Mattco's Paramount, California office, where he had access to documents, including documents regarding steel forging jobs Mattco performed for General Electric. When he asked Minguez to recreate or replicate a cost estimate sheet for a General Electric steel forging job, Blumer asked Minguez to "work these up as you would have worked them up at the time—what I'll call request for quotation." Minguez recreated or replicated "non-contemporaneous estimate sheets" for General Electric steel forging jobs on which Blumer could not locate cost estimate sheets. He gave them to Blumer, who intended to consider them in connection with Arthur Young's analysis of Mattco's estimated lost profits. Blumer located other "contemporaneous estimate sheets" in Mattco's files.

Blumer never told Minguez that Blumer would include the noncontemporaneous estimate sheets in Arthur Young's workpapers or that they would be produced to General Electric. Blumer did not tell Lamping, the supervising partner, that he had Minguez prepare noncontemporaneous estimate sheets. Blumer instructed Minguez to prepare noncontemporaneous estimate sheets to assist Blumer in understanding and calculating costs Mattco incurred in performing steel fabricating jobs for General Electric. Blumer did not believe the noncontemporaneous sheets were prepared to inflate Mattco's damage figure. Arthur Young had no personal knowledge or evidence supporting its allegations that information in the noncontemporaneous estimate sheets was false, fraudulent, or fabricated, or that Mattco and Minguez concocted a scheme to provide documents with fraudulent dates to induce Arthur Young to use fraudulent data when computing Mattco's lost profits and artificially increase Mattco's damages.

Arthur Young has no direct personal knowledge or evidence to support its allegation that Minguez told Blumer the noncontemporaneous estimate sheets were authentic, genuine, true, original, or anything other than Minguez's best estimates. Blumer asked Minguez only for his best recollection of what the estimates would have contained, and did not expect the work-ups to replicate exactly the missing estimate sheets. Blumer did not date the work-ups. In November 1986, Blumer had copies made of Mattco documents he had viewed concerning General Electric steel forging jobs, including the work-ups Minguez made, to take back to Blumer's office in Cincinnati.

On December 4, 1986, General Electric propounded its first request for document production to Mattco, seeking all documents related to Mattco's lost profits: contracts and documents relating to bidding, negotiation, award, and performance of contracts; documents relating to volume of sales and parts; documents relating to Mattco's lost business, profits, or reputation; documents relating to Mattco's expenditure of funds to enlarge its business to perform under the contracts; all estimate sheets and quote sheets respecting the "095 part" and the "095" order; and documents relating to Mattco's financial statements.

Mattco's attorney, Helmer, informed Arthur Young it would be necessary to produce all the documents and workpapers Arthur Young had used in serving as Mattco's expert. Blumer or Arthur Young personnel gathered copies of the noncontemporaneous estimate sheets, knew they would be produced to General Electric, did not distinguish the noncontemporaneous estimate sheets he requested Minguez to prepare from the contemporaneous estimate sheets that Blumer had located and copied, and stapled the noncontemporaneous estimate sheets to other documents. Lamping did not recall

reviewing the workpapers before Blumer delivered them to Mattco's attorneys' office on March 20, 1987. Blumer did not tell Mattco's attorneys that some documents delivered should not be produced in document production.

Mattco's attorneys placed identification numbers and confidentiality stamps on the papers Blumer provided, and removed approximately 15 documents subject to the work product doctrine or otherwise privileged. On March 21, 1987, Mattco's attorneys forwarded most of the nonprivileged documents received from Blumer, and sent the remaining documents on April 8, 1987. On April 17, 1987, Arthur Young submitted a bill for work performed on the Mattco engagement during February and March 1987, described as time spent in finalization and partner review of workpapers before they were given to Mattco's attorneys for submission to General Electric.

In delivering the workpapers to Mattco's attorneys for document production, Blumer said nothing about how the workpapers included copies of noncontemporaneous estimate sheets. He did not tell Mattco's attorneys that he had instructed Minguez to prepare noncontemporaneous estimate sheets or that Arthur Young's workpapers contained copies of them until at least three months after they had been produced to General Electric. Lamping never told any Mattco attorney that the documents were in Arthur's Young's workpapers. Arthur Young did not tell Minguez that the workpapers contained the documents.

The federal district court's September 12, 1988, sanctions order was not a final order of Mattco's claims in its suit against General Electric. Defendants in the Los Angeles Superior Court case were not parties in the federal district court case, and despite Mattco's request, the federal district court judge did not conduct an evidentiary hearing on issues addressed in the sanctions order. The sanctions order did not address the relative fault of Mattco and Arthur Young. Lamping testified that the federal district court judge ruled erroneously, did not understand the issues or Arthur Young's approach, and came to incorrect conclusions.

In the hearing on the summary judgment motion, the trial court stated it had taken judicial notice of the federal district court's rulings. The judgment filed March 28, 1991, granted the defendant's summary judgment motion on the ground that the unclean hands doctrine and the absolute litigation privilege barred plaintiffs' action as a matter of law.

## ISSUES

Plaintiffs claim on appeal that the trial court:

1. Erroneously held that as a matter of law section 47, subdivision (b), shields defendants from liability; and

2. Erroneously disregarded allegations on relative fault, overlooked disputed factual issues on the defense of unclean hands, and erroneously based its grant of summary judgment on the federal court's sanction order.

DISCUSSION

1. *The Section 47 Litigation Privilege*

 Plaintiffs claim on appeal that the trial court erroneously ruled that section 47 shields defendants from liability stemming from their conduct. Plaintiffs argue that the ruling contradicted the policy underlying the statute and precedent interpreting the privilege.

Section 47, subdivision (b), states: "A privileged publication or broadcast is one made: . . . In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure. . . ."

 Several policies underlie the privilege. First, it affords litigants free access to the courts to secure and defend their rights without fear of harassment by later suits. Second, the courts rely on the privilege to prevent the proliferation of lawsuits after the first one is resolved. Third, the privilege facilitates crucial functions of the trier of fact. (*Abraham* v. *Lancaster Community Hospital* (1990) 217 Cal.App.3d 796, 813 [266 Cal.Rptr. 360].)

 The statutory privilege protects attorneys, judges, jurors, witnesses, and other court personnel from liability arising from publications made during a judicial proceeding. (*Rosenfeld, Meyer & Susman* v. *Cohen* (1983) 146 Cal.App.3d 200, 231 [194 Cal.Rptr. 180].) Although originally enacted in the context of defamation actions, the privilege now applies to "any communication, whether or not it amounts to a publication [citations], and all torts except malicious prosecution. [Citations.] Further, it applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved. [Citations.]" (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 212; see also pp. 215-216 [266 Cal.Rptr. 638, 786 P.2d 365].)

As usually formulated, "the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other

participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. [Citations.]" (50 Cal.3d at p. 212.)

In *Silberg*, for example, a husband and wife had agreed, in their marital dissolution, to evaluation by an independent psychologist to determine visitation and custody arrangements. The husband later sued his former wife's attorney for "intentional tort." The complaint alleged that the attorney had recommended an independent psychologist to perform the counseling. The recommended psychologist, however, was neither neutral nor independent, but instead had an unspecified, preexisting relationship with the former wife's attorney. The husband alleged that the defendant attorney failed to disclose the existence and nature of the relationship with the psychologist, and used the relationship to influence the psychologist to the advantage of plaintiff's former wife. Under these circumstances, *Silberg* held that the privilege protected the defendant from suit.

*Howard* v. *Drapkin* (1990) 222 Cal.App.3d 843, 848, 864 [271 Cal.Rptr. 893], and *Gootee* v. *Lightner* (1990) 224 Cal.App.3d 587, 591-596 [274 Cal.Rptr. 697], also involved a situation in which both husband and wife in a dissolution proceeding stipulated to retain a psychologist to evaluate and make recommendations concerning custody or visitation arrangements. *Howard* and *Gootee* held that the privilege protected the consulting psychologist—a "neutral expert," as distinct from the opposing counsel in *Silberg*—from later tortious claims based on testimony in the underlying lawsuit.

*Howard* emphasized the unique role of "neutral third persons . . . engaged in mediation, conciliation, evaluation or other similar dispute resolution efforts. . . ." (*Howard* v. *Drapkin*, *supra*, 222 Cal.App.3d at p. 851, fn. 2.) Although recognizing that the two were "not coextensive," *Howard* relied on both quasi-judicial immunity and the statutory privilege as the basis for holding that the independent psychologist, hired by both husband and wife, was protected from subsequent suit. (*Id.*, at pp. 850-851, 864.)

The case at bench differs from *Gootee* and *Howard* because Mattco does not sue an expert witness hired jointly by adverse parties as a neutral, dispute-resolving participant. The instant case also differs from those cases, reviewed *infra*, in which a party sues an expert witness hired by an opposing party. And this appeal differs from *Silberg* because it does not involve a suit against an adverse attorney for allegedly interfering with a neutral, dispute-resolving participant. Instead this appeal involves causes of action sounding in contract and in tort against an expert witness hired by plaintiffs themselves to support their case in the underlying lawsuit.

In such a situation, policy considerations that would usually favor the privilege here argue against applying it. "Freedom of access to the courts and encouragement of witnesses to testify truthfully will be harmed if neutral experts must fear retaliatory lawsuits from litigants whose disagreement with an expert's opinions perforce convinces them the expert must have been negligent in forming such opinions." (*Gootee* v. *Lightner, supra,* 224 Cal.App.3d at p. 593.)

Arthur Young was not a "neutral expert," but one hired by Mattco. If an expert witness's negligence and breach of contract cause dismissal of the party who hired that expert witness, that does not expand freedom of access to the courts. Applying the privilege in this circumstance does not encourage witnesses to testify truthfully; indeed, by shielding a negligent expert witness from liability, it has the opposite effect. Applying the privilege where the underlying suit never reached the trial stage would also mean that the party hiring the expert witness would have to bear the penalty for the expert witness's negligence. That result would scarcely encourage the future presentation of truthful testimony by that witness to the trier of fact.

Defendants rely on *O'Neil* v. *Cunningham* (1981) 118 Cal.App.3d 466, 477 [173 Cal.Rptr. 422], in which the appellant, an anesthesiologist, was one of several defendants in a medical malpractice suit. The malpractice insurance carrier hired an attorney to represent it and the other defendants. In a letter written to his client-employer, the insurer, the attorney made false statements about the appellant. The letter came into the hands of appellant's superiors, who then terminated his contract. He sued the attorney for negligence.

Because the privilege addressed itself to a publication "made in any judicial proceeding" and did not address itself either to the defamer or to the defamed, *O'Neil* held that the privilege protected an attorney who defamed his own client. *O'Neil* nonetheless noted that the defendant "was able to become, nominally, appellant's attorney while he was solely [the insurer's] lawyer. . . ." (118 Cal.App.3d at p. 470.) *O'Neil* thus involves an attorney only "nominally" representing, but neither hired nor paid by, a client whose interests may conflict with other clients that attorney also represents. *O'Neil* therefore remains an unclear precedent for the case at bench, involving an expert witness hired and paid by Mattco.

Regarding the specific issue raised by the case at bench, several cases have applied the litigation privilege to protect statements by an expert witness. But they involve suits against expert witnesses who functioned *adversely* to the plaintiff. (*ITT Telecom Products Corp.* v. *Dooley* (1989) 214

Cal.App.3d 307, 316-317 [262 Cal.Rptr. 773] [privilege protected defendant's former employee who as consultant provided plaintiff with information based on his former employment. The privilege did not, however, protect disclosures that breached a written contractual provision not to reveal employer's trade secrets, at p. 320]; *Bernstein* v. *Alameda etc. Med. Assn.* (1956) 139 Cal.App.2d 241, 245-246 [182 Cal.Rptr. 438] [county medical association expelled physician for ethics violation based on defamatory statements about a pathologist's autopsy report prepared for use in worker's compensation litigation by decedent's wife; privilege protected physician as an expert witness]; *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 392-394 [182 Cal.Rptr. 438] [privilege protected coroner's erroneous report to district attorney from later suit by plaintiff subjected to criminal murder and child neglect charges]; *Carden* v. *Getzoff* (1987) 190 Cal.App.3d 907, 913-916 [235 Cal.Rptr. 698] [privilege protected accountant hired by wife to value husband's medical practice in dissolution proceedings despite falsehoods in accountant's report].)

*Carden* recognizes the importance of the distinction. "[W]hen there is a good faith intention to bring a suit, even malicious publications 'are protected as part of the price paid for affording litigants the utmost freedom of access to the courts.' [Citations.] Otherwise, *adverse* witnesses would always be fearful of subsequent civil suits and would be extremely hesitant or unwilling to testify." (*Carden v Getzoff, supra,* 190 Cal.App.3d at p. 915, italics added.) As this reasoning suggests, the litigation privilege does not exist to protect one's own expert witnesses, but to protect adverse witnesses from suit by opposing parties after the lawsuit ends.

 None of these cases provides a precedent for applying the statutory privilege to protect a "friendly" expert witness. Neither do the parties provide such a case, except for *Bruce* v. *Byrne-Stevens & Associates Eng.* (1989) 113 Wn.2d 123 [776 P.2d 666]. In *Bruce,* two plaintiffs sued a neighbor for soil subsidence, and hired an engineering firm to calculate and testify about the cost of stabilizing the soil on plaintiffs' land. Plaintiffs won a judgment for the amounts the expert witness testified it would cost to restore lateral support. Alleging that restoring lateral support actually proved to cost double the amount he estimated at trial, however, plaintiffs later sued their own expert witness for negligence. The Washington Supreme Court held the expert witness's testimony immune from suit.

As a Washington case, of course, *Bruce* is not precedent in California. *Bruce* also relied on the common law immunity of parties and witnesses from subsequent damages liability, not on a statute. (776 P.2d at p. 667.) Third, the suit in *Bruce* followed the expert's trial testimony, arising because

plaintiffs alleged that the expert had undervalued their damages. Mattco's suit never reached trial, and did not involve the expert's testimony valuing of damages.

The last factor becomes important because one of the policies supporting the litigation privilege states: "[T]he law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result. [Citations.]" (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 214.) This policy can logically apply, however, only to trial testimony of adverse witnesses. The case at bench involves a pretrial dispute between a party and its own expert witness that arose during discovery.

The analogy between a party bringing a suit against its own expert witness and the party bringing a suit against its own attorney has some relevance. ▉ As stated in *Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 209 [271 Cal.Rptr. 191, 793 P.2d 524], the litigation privilege shields "litigants, attorneys and witnesses from liability for . . . virtually all torts except malicious prosecution. [Citations.]" Yet if it also protected an attorney from any suit by a former client, no malpractice suit could be brought.

Sometimes the litigation privilege is called "absolute." (See, e.g., *O'Neil* v. *Cunningham, supra,* 118 Cal.App.3d 466, 473.) This characterization overstates the matter. The privilege applies only to tort causes of action, and not to the tort of malicious prosecution. (*Silberg* v. *Anderson, supra,* 50 Cal.3d at pp. 215-216.) The privilege does not protect, moreover, a claim for damages under the Invasion of Privacy Act (Pen. Code, § 630 et seq.), a psychotherapist's voluntary disclosure during a custody proceeding of a patient's confidential communications, or, as we have seen, statements made in a judicial proceeding that violate a contractual provision not to disclose a former employer's trade secrets. (*Kimmel* v. *Goland, supra,* 51 Cal.3d 202; *Cutter* v. *Brownbridge* (1986) 183 Cal.App.3d 836, 841-848 [228 Cal.Rptr. 545]; and *ITT Telecom Products Corp.* v. *Dooley, supra,* 214 Cal.App.3d 307.)

▉ Applying the privilege to bar plaintiffs' suit against an expert witness hired to assist them in litigation, under the circumstances alleged, does not further the policies underlying section 47, subdivision (2). We therefore find the grant of summary judgment in favor of defendants erroneous.

## 2. *The Federal Court's Sanction Order*

Plaintiffs claim on appeal that the trial court incorrectly based its ruling on the facts referred to in the federal district court's order on sanctions, overlooked disputed factual issues relating to defendants' unclean hands defense, and failed to consider the factual dispute concerning the relative fault of plaintiffs and defendants.

In ruling that the doctrine of unclean hands barred plaintiffs' actions, the trial court took judicial notice of and relied on the federal district court's September 15, 1988, order for sanctions.

Traditionally, collateral estoppel has been applied to bar relitigation of an issue decided in a prior court proceeding. The doctrine has several threshold requirements. "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.] The party asserting collateral estoppel bears the burden of establishing these requirements. [Citations.]" (*Lucido* v. *Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223, 2 A.L.R.5th 995].)

As to the first point, the federal district court decided that plaintiffs had attempted to "fraudulently increase the damages they seek to claim in this action, altered and fabricated estimate sheets used to help calculate those damages." The court further found that plaintiffs "knowingly produced those false estimate sheets to defendants, and thereby perpetrated a fraud upon defendants, this Court, and the judicial process."

Strong words. But the federal district court did not adjudicate a dispute between Mattco and Arthur Young. It made no findings on the allegations relating to the causes of action in the case at bench. Thus the federal district court findings satisfy neither the first, second, nor the third prong required to apply the collateral estoppel doctrine.

The federal district court's sanction order does not collaterally estop the Mattco plaintiffs' suit against the Arthur Young defendants on the issue of the unclean hands doctrine. As a general rule, application of the unclean hands doctrine remains primarily a question of fact. (*Insurance Co. of North*

*America* v. *Liberty Mutual Ins. Co.* (1982) 128 Cal.App.3d 297, 306-307 [180 Cal.Rptr. 244].) As such it is not properly determined either on a summary judgment motion or by reference to collateral estoppel principles. On this ground also the trial court erroneously granted summary judgment.

### DISPOSITION

The grant of summary judgment is reversed. Costs are awarded to appellants.

Danielson, Acting P. J., and Croskey, J., concurred.

Respondents' petition for review by the Supreme Court was denied July 9, 1992.