115 Cal.Rptr.2d 342 (2002)
95 Cal.App.4th 154
Brent FERGUSON et al., Plaintiffs and Appellants,
v.
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP et al., Defendants and Respondents.
No. A091877.
Court of Appeal, First District, Division Four.
January 11, 2002.
Review Granted May 1, 2002.
*344 Adams Nye Sinunu Walker LLP, David J. Becht, Bruce Nye, San Francisco, Ross L. Libenson, for appellants.
Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Ethan P. Sehulman, Deborah A. Kane, San Francisco, for respondents.
*343 REARDON, Acting P.J.
Appellants, objectors to a proposed class action settlement in the In re Unocal Refinery Litigation stemming from a chemical release at the Unocal refinery in Rodeo, sued class counsel shortly after they secured awards in an arbitration proceeding established to allocate the settlement fund.[1] The trial court sustained demurrers to their fraud causes of action and then entered summary judgment in favor of Lieff Cabraser. We affirm the order sustaining the demurrer as well as the summary judgment.

I. BACKGROUND

A. Class Action Lawsuit and Stipulation

In August 1994 a processing tower at the Unocal refinery in Rodeo developed a leak, resulting in release into the atmosphere of the toxic chemical compound "Catacarb." Thousands of residents from neighboring communities were affected.
Respondent law firm Lieff Cabraser filed a class action complaint against Unocal in February 1995. Other firms filed complaints against Unocal on behalf of individuals and on behalf of putative classes. For example, appellants signed contingent fee contracts with Michael Meadows and the Casper, Meadows & Schwartz firm (Casper Firm) to represent them against Unocal, and they were named as plaintiffs in an action filed by the Casper Firm on behalf of multiple individual plaintiffs. (Abercrombie et al. v. Union Oil Company of California et al. (Super. Ct. Contra Costa County No. C94-04141).)
*345 Pursuant to a pretrial order, the trial court consolidated the related actions, designating them as "complex litigation" and assigning them for all purposes to a single department. The court vested primary responsibility for managing the litigation with a steering committee of plaintiffs' counsel, with Lieff Cabraser appointed as co-lead class counsel and co-liaison counsel and the Casper Firm appointed as co-lead direct action counsel and co-liaison counsel.
Lieff Cabraser submitted the first amended complaint in February 1996, identifying four potential classes: personal injury, property damage, medical monitoring and punitive damages. Four months later Lieff Cabraser, its co-lead class counsel and Unocal entered into a stipulation and proposed order concerning class certification, subject to court approval. They agreed as follows: (1) plaintiffs would withdraw the allegations of the personal injury and property classes; (2) notice of withdrawal would be by publication in a manner approved by the court; (3) the parties would stipulate to certification of a mandatory, non-opt-out punitive damages class, defined as all persons entitled to compensatory damages as a result of the "Catacarb" release; (4) the issue of certification of a medical monitoring class would be scheduled for briefing and decision by the court; (5) individuals with claims for personal injury or property damage would be given 60 days to file claims; and (6) in the event Unocal moved to substantially modify or decertify the punitive damages class, plaintiffs could move to certify the personal injury and property classes, on an expedited basis.
The court approved the stipulation after a hearing at which Michael Meadows, appellants' individual counsel, participated. The stipulation and order was served on appellants' counsel.
The court also approved the form of notice to all class members advising them of withdrawal of the class action allegations concerning personal injury and property damage claims, and found that "[notice as specified in [the] stipulation shall be deemed adequate notice to all class members." The notice was published October 7, 18, 25 and November 1, 1996, in the San Francisco Chronicle.
Meanwhile, Lieff Cabraser engaged in extensive discovery. From January through July 1996, the firm conducted depositions on a nearly daily basis, reviewed hundreds of thousands of pages of documents and consulted extensively with experts in the fields of toxicology, chemistry, air dispersion modeling, property valuation, refinery operation and litigation risk assessment. Plaintiff claims questionnaires were reviewed, individual claims were worked up and dozens of Unocal employees were deposed.

B. Settlement

Beginning in September 1996 Lieff Cabraser began negotiating in earnest with Unocal, often with the assistance of Judge Daniel H. Weinstein (ret.), the court-appointed settlement master. Judge Weinstein reviewed written submissions, met with counsel, presided over presentations by expert witnesses and conducted a joint settlement conference during which time he monitored excerpts of video depositions. Negotiations culminated in April 1997 with a tentative $80 million global settlement of the consolidated class and individual actions. The proposed settlement called for dismissal of the punitive damage allegations.
In the beginning of May 1997, the court approved a stipulated order of reference to Judge Weinstein, referring all issues concerning the good faith and scope of the settlement as well as the allocation of Unocal's *346 settlement payment among plaintiffs. Judge Weinstein endorsed the settlement, observing: "At all times, the negotiations were conducted at arm's length by highly qualified counsel who were thoroughly knowledgeable about the evidence and the law. These attorneys have been fully cooperative in sharing factual and legal information with me to allow me to become thoroughly knowledgeable in connection with the potential trial exposure of defendants. The $80,000,000 settlement which was reached is, in my opinion, a fair, reasonable, and just settlement for all of the settling parties. This negotiated settlement could not have been achieved without Class Counsel's agreement to dismiss with prejudice the punitive damage allegations of the non-opt-out punitive damage class.... [¶] I respectfully recommend that the Court grant Class Counsel's motion to dismiss the punitive damages class claims with prejudice. I have received and considered the handful of objections to the proposed dismissal, ... and find these objections to be unpersuasive."
The court set the motion to dismiss the punitive damages class claims for hearing on June 27, 1997, and ordered class counsel to send notice of the hearing by first class mail to all known members of the punitive damages class. As well, the court ordered publication of notice.
Notice was published in the San Francisco Chronicle on June 9 and 12, 1997, and the West County Times on June 6 and 9, 1997. On June 6, 1997, the court-approved notice was mailed to 12,186 persons identified by class counsel as all persons who might be entitled to compensatory damages. That notice cautioned that a determination to dismiss the punitive damages class claims would be binding on all class members and such dismissal would bar any further suit by or on behalf of class members for punitive damages against Unocal. The notice also specified that objections to the dismissal must be received and served by June 20,1997.
On June 12, 1997, Lieff Cabraser moved to dismiss the punitive damages class claims and served the motion on appellants' individual counsel. The motion included authorizations from attorneys for individual plaintiffs permitting Lieff Cabraser to dismiss their claims in exchange for participation in the $80 million global settlement. Attorney Michael Meadows attended plaintiffs' counsel meeting where he and others signed a document authorizing such dismissal on behalf of appellants.
Appellants admitted that they received notice of the hearing in early June 1997, prior to the hearing date. Indeed, they both filed timely, written objections. Appellant Ferguson attended the hearing and personally spoke against the settlement. Their objections went solely to the purported insufficiency and unfairness of the settlement.[2] Appellants proceeded in pro. per. because the Casper Firm refused to represent them in objecting to or opposing the dismissal and they were unable to find another lawyer to assist them. Eight objections in total were received, out of a total class of over 12,000.
The court approved the settlement and dismissed the class action, remarking as follows: "I have had extensive communication *347 with Judge Weinstein, and he has approached this settlement in the manner in which I would have expected him to. I think a lot of consideration, time and effort has gone into determining whether or not this is a fair settlement. Judge Weinstein feels it is a fair settlement for all parties concerned and that it is a very liberal settlement for the plaintiffs." Further, addressing objecting class members the court stated: "I'm . .. satisfied that those concerns that you have have been fully considered by the class counsel that are proposing this settlement. And I'm satisfied that this appears to be a fair and reasonable settlement for all parties involved .... [f] My understanding [is] that the $80 million settlement does encompass all punitive damages claims that have been filed, and I'm hearing from everyone that I have a great deal of confidence in that this is a settlement that should be approved and that the dismissal of the punitive damages claims would be appropriate."
In the written order dismissing the punitive damages class claims, the court indicated it had concluded that "the public's interest in punishing Unocal for its conduct at its San Francisco Refinery, and in deterring Unocal from future such conduct has been achieved." Judgment of dismissal was entered; no appeal followed.
Thereafter, Unocal applied with success for a finding under Code of Civil Procedure section 877.6 that the settlement was made in good faith.

C. Attorney Fees; Allocation

As part of the settlement, Judge Weinstein awarded attorney fees and approved a final plan of allocation. Co-lead class counsel received $6,625,000 in attorney fees, with direct action counsel receiving $2.8 million.
Pursuant to the final allocation plan, eligible claimants could take a one-time cash payment of up to $3,250[3] for relatively minor injuries, without proof of medical or economic injury. Those rejecting the cash-out payment could apply to the special master for an individual award. These potential middle level ($25,000 or less) and serious injury (more than $25,000) cases would be evaluated by a panel including a lawyer/judge, a doctor, and where appropriate, a toxicologist. The adjudicated awards could be appealed within 10 days of the award. Claimants who chose not to accept the predetermined cash payment or to proceed through the nonadversarial arbitration process for midlevel or serious claims could pursue compensatory damages through a jury trial.
Appellants opted not to sue Unocal for compensatory damages and instead participated in the settlement claims process, represented by the Casper Firm. Ferguson and Prieto received awards of $125,000 and $100,000 respectively.

D. Present Litigation

Two weeks after receiving their arbitration awards, appellants filed this action against Lieff Cabraser, Michael Meadows and the Casper Firm. The third amended complaint alleged 11 causes of action, including negligence, legal malpractice, breach of fiduciary duty, fraud, and unjust enrichment. The gist of the complaint was that the settlement and notices related thereto were inadequate and Lieff Cabraser breached its duty to appellants by certifying the non-opt-out punitive damages class, negotiating and recommending the settlement and refusing to support their objections. Each cause alleged that *348 appellants suffered loss of a potential award of punitive damages against Unocal and that they received a compensatory damages award far below what they could have received had defendants acted differently. Appellants also sought punitive damages, damages for emotional distress and personal injuries, and disgorgement of attorney fees.
Lieff Cabraser demurred successfully to the fraud-related causes of action. The court ruled that (1) appellants had notice of all events through counsel and therefore there could be no misrepresentation or omission upon which they relied; and (2) the litigation privilege prevented further actions against defendants.
Next, Lieff Cabraser moved for summary judgment on the remaining causes of action. Granting summary judgment, the trial court ruled that the doctrine of collateral estoppel barred the remaining claims because the undisputed evidence demonstrated that (1) appellants were parties in the underlying coordinated class and individual litigation which ended in a final judgment on the merits; and (2) the fairness and adequacy of the settlement and the adequacy of Lieff Cabraser's representation of the class were actually and necessarily decided by the court in approving the settlement and dismissing the class action. Moreover, the undisputed evidence showed that appellants were not deprived of due process in the underlying litigation. This appeal followed.

II. DISCUSSION

A. Demurrer

Appellants insist that the trial court erred in sustaining Lieff Cabraser's demurrer to their fraud causes of action. The lower court ruled that knowledge of all relevant events and notices by the Casper Firm was imputed to them. That being the case, appellants could not have relied on any alleged representation or omission by Lieff Cabraser.
This ruling was sound. As a matter of law, any knowledge in the hands of the attorney (Casper Firm) is imputed to the client (appellants). (Stalberg v. Western Title Ins. Co. (1991) 230 Cal.App.3d 1223, 1231, 282 Cal.Rptr. 43; see Civ.Code § 2332.)
Appellants argue that the imputed knowledge doctrine does not apply because both Lieff Cabraser and the Casper Firm were "defalcating" agents. Say appellants: "[The Casper Firm], with whom Appellants had an attorney-client contract, associated with [Lieff Cabraser] in the action against Unocal and [ ] both sets of attorneys conspired against Appellants." The first problem with this statement is appellants' assumption that Lieff Cabraser "associated with" the Casper Firm, thereby entering into a direct attorney-client relationship with them. Not so.
According to the complaint, appellants signed contingent fee contracts with Michael Meadows and the Casper Firm to represent them as their attorney in the Unocal action. On the other hand, the court appointed Lieff Cabraser as colead class action counsel and co-liaison counsel.[4] Appellants contend that until the class was certified, Lieff Cabraser was *349 not class counsel and instead owed responsibilities to them as individuals, citing Mandujano v. Basic Vegetable Products, Inc. (9th Cir.1976) 541 F.2d 832, 834-835.[5] We disagree. At that point in time they were potential class members represented individually by their own attorney. Putative or potential class members are not "represented" by lead counsel, and other attorneys may contact them. (Atari, Inc. v. Superior Court (1985) 166 Cal.App.3d 867, 872, 212 Cal.Rptr. 773; In re McKesson HBOC, Inc. Securities Litigation (N.D.Cal.2000) 126 F.Supp.2d 1239, 1245.) Further, "[w]hile lead counsel owes a generalized duty to unnamed class members, the existence of such a fiduciary duty does not create an inviolate attorney-client relationship with each and every member of the putative class." (Ibid.)
After certification, Lieff Cabraser's duties ran to the class as a whole and did not depend on individualized representation of individual class members. (See 7-Eleven Owners for Fair Franchising v. Southland Corp. (2000) 85 Cal.App.4th 1135, 1159, 102 Cal.Rptr.2d 777; Parker v. Anderson (1982) 667 F.2d 1204, 1211; Blanchard v. EdgeMark Financial Corp. (N.D.Ill.1997) 175 F.R.D. 293, 307 ["One of the factors unique to class litigation is the existence of a class, rather than individual, client. Stated another way, in a class suit, class counsel's client is the group which comprises the class, rather than any individual class member"].)
Simply put, Lieff Cabraser was not appellants' agent for purposes of providing individual notice of class certification and settlement matters. Its obligations with respect to notice to class members were accomplished through the court-approved notice process. Lieff Cabraser could not realistically be expected to communicate on a regular basis with over 12,000 individual claimants. This was the job of retained counsel such as the Casper Firm. Appellants admit that the Casper Firm had knowledge of all essential facts and phases of the proceedings. That knowledge was imputed to appellants and thus their causes of action for breach of duty to disclose and constructive fraud as against Lieff Cabraser must fail.
Appellants also argue that the doctrine of imputed notice does not apply because Lieff Cabraser colluded with the Casper Firm to defraud them. Appellants did allege conspiracy to commit fraud. But again, this cause of action assumes duties on the part of Lieff Cabraser that would stem from an independent attorney-client relationship, not from their role as class counsel. For example, appellants alleged that Lieff Cabraser furthered the conspiracy by "secretly stipulating to a non-opt out punitive damages class without notice to Plaintiffs, failing to disclose the terms of the settlement to the Plaintiffs in time to gain effective service of counsel and settling the lawsuit without Plaintiffs' consent."
To the extent appellants' conspiracy claim is based on assertions of misrepresentation or inadequate disclosure in, or timing of, the court-approved notice of class certification or notice of proposed settlement and dismissal of punitive damages class claims, that claim is barred by the litigation privilege. Civil Code section 47 provides: "A privileged publication or broadcast is one made: [¶] ... [¶] (b) In any .... (2) judicial proceeding." (Id. subd. (b)(2).) This privilege applies to any communication, whether or not it amounts *350 to a publication, and to all torts except malicious prosecution. Further, it shields any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and does not involve any function of the court or its officers. (Silberg v. Anderson (1990) 50 Cal.3d 205, 212, 266 Cal.Rptr. 638, 786 P.2d 365.)
The privilege protects attorneys, judges, jurors, witnesses and other court personnel from liability stemming from publications made during a judicial proceeding. (Mattco Forge, Inc. v. Arthur Young & Co. (1992) 5 Cal.App.4th 392, 402, 6 Cal.Rptr.2d 781 (Mattco).) It advances several important policies: First, the privilege affords litigants free access to the courts without fear of harassment by subsequent lawsuits. As well, courts rely on the privilege to prevent proliferation of lawsuits. Finally, the privilege facilitates crucial functions of the trier of fact. (Ibid.)
Appellants contend that the privilege only protects attorneys adverse to a party, relying on Mattco. There, the plaintiffs hired an accounting firm to provide litigation support for them in an action against an electric company. After dismissal of the underlying suit, the plaintiffs sued the accounting firm for professional malpractice and other torts. The trial court granted summary judgment, finding that the litigation privilege shielded the defendants from liability.
Reversing, the reviewing court held that the privilege does not protect a negligent expert witness from liability to the party hiring the witness to assist in litigation, reasoning that policy considerations that normally would favor the privilege argue against it in this situation. "If an expert witness's negligence and breach of contract cause dismissal of the party who hired that expert witness, that does not expand freedom of access to the courts. Applying the privilege in this circumstance does not encourage witnesses to testify truthfully; indeed, by shielding a negligent expert witness from liability, it has the opposite effect. Applying the privilege where the underlying suit never reached the trial stage would also mean that the party hiring the expert witness would have to bear the penalty for the expert witness's negligence." (Mattco, supra, 5 Cal. App.4th at p. 404, 6 Cal.Rptr.2d 781.) The court also found it significant that the case never reached trial. The policy that litigants bear the burden at trial of exposing witness bias and falsity of evidence can only apply to the trial testimony of adverse witnesses, not to pretrial disputes between a party and its own expert witness. (Id. at p. 406, 6 Cal.Rptr.2d 781.)
Were the Casper Firm attempting to assert the litigation privilege, the rationale of Mattco would be compelling because free access to the courts is not advanced by immunizing a party's own attorney from liability for fraud. But again, class counsel was appointed by the court to represent the class in judicial proceedings and to communicate with the class concerning those proceedings. Unlike Mattco, appellants did not hire class counsel, and thus class counsel did not play the same "friendly" role as the "friendly" expert witness in that case. (Mattco, supra, 5 Cal. App.4th at p. 405, 6 Cal.Rptr.2d 781.) And, while theoretically class counsel is not an "adverse" player, the potential for conflicting interests among class counsel, class representatives and absent class members is inherent in this form of action. (See 7-Eleven Owners for Fair Franchising v. Southland Corp., supra, 85 Cal. App.4th at p. 1159, 102 Cal.Rptr.2d 777.) In the structure of a class action, class members have opportunities to object to *351 actions taken by class counsel, particularly where, as here, appellants are represented by direct counsel. Under the circumstances of this case, the salutary legislative purpose of avoiding a roundelay of lawsuits trumps the occasional unfair result that might occur but for the privilege.

B. Summary Judgment

1. Standard of Review

Summary judgment in favor of a defendant is proper if (1) the defendant shows that one or more elements of a cause of action cannot be established or there is a complete defense to it; and (2) the plaintiff fails to meet his or her burden of showing the existence of a triable issue of material fact. (Code Civ. Proc, § 437c, subd. (o)(2).) Because a summary judgment motion raises only questions of law, we independently review the trial court's grant of summary judgment. (Rosse v. DeSoto Cab Co. (1995) 34 Cal.App.4th 1047, 1050, 40 Cal.Rptr.2d 680.)

2. Appellants Cannot Recover Any Damages from Lieff Cabraser

Appellants sought to recover for loss of a "potential" award of punitive damages as well as an inadequate award of compensatory damages. However, no claim for compensatory damages exists. Appellants participated in the claims settlement, receiving awards that were only-reduced by amounts advanced on their behalf by the Casper Firm and the contingent fees they contractually agreed to pay retained counsel. Moreover, appellants could have rejected the claims process and filed their own suit for compensatory damages, but did not.
Thus, the only damages at issue on summary judgment were the potential punitive damages claims. Appellants' third amended complaint attacked Lieff Cabraser's conduct in negotiating and recommending the $80 million settlement which denied them the ability to seek punitive damages against Unocal. With respect to this issue, as a matter of law lost punitive damages are not recoverable as compensatory damages for legal malpractice.[6] (Piscitelli v. Friedenberg (2001) 87 Cal.App.4th 953, 981-982, 105 Cal.Rptr.2d 88.) With no damages left against Lieff Cabraser, their claims against the firm cannot survive summary judgment.[7] (See Nagy v. Nagy (1989) 210 Cal.App.3d 1262, 1268-1269, 258 Cal.Rptr. 787.)
*352 In Piscitelli, the plaintiff sued his attorney for professional malpractice after the attorney failed to opt the plaintiff out of a separate class action against his employer, which resulted in release of claims that would have been presented to an arbitration panel. The jury award included an amount representing punitive damages that would have been awarded in the underlying arbitration proceeding. Reversing, the reviewing court reasoned that the measure of damages in a legal malpractice action is the value of the lost claim. However, punitive damages are not compensation for loss; rather, their sole purpose is to punish and deter. Imposition of punitive damages is triggered by the state of mind and conduct of the tortfeasor, not by the nature of the plaintiffs loss. (Piscitelli v. Friedenberg, supra, 87 Cal.App.4th at pp. 979-980, 105 Cal. Rptr.2d 88 [taking issue with Merenda v. Superior Court (1992) 3 Cal.App.4th 1, 12, 14, 4 Cal.Rptr.2d 87, which characterized unrecovered punitive damages as compensatory damages on the theory that such damages represent a loss or harm suffered by plaintiff].)
Whatever the plaintiffs injury, he or she will be made whole by the award of compensatory damages. Indeed, punitive damages are awarded "in addition to the actual damages" (Civ.Code, § 3294, subd. (a), italics added) and as to the plaintiff, represent a boon. To relabel as compensatory an award intended to punish a wrongdoer guilty of oppression, malice or fraud causes an innocent defendant to suffer that wrongdoer's punishment. (Piscitelli v. Friedenberg, supra, 87 Cal.App.4th at p. 981, 105 Cal.Rptr.2d 88.)
We concur with the reasoning and policy rationale informing the decision in Piscitelli. Accordingly, appellants may not recover lost punitive damages against Lieff Cabraser. This conclusion defeats a crucial element of their claim against the firm.

III. DISPOSITION
The order sustaining Lieff Cabraser's demurrer to appellants' fraud causes of action is affirmed. The summary judgment on the legal malpractice and breach of fiduciary causes of action is likewise affirmed.
We concur: SEPULVEDA, J. and KAY, J.
NOTES
[1] Appellants herein are Brent Ferguson and Florencia Prieto. Respondents are Lieff, Cabraser, Heimann & Bernstein, LLP and three attorneys of the firm, William Bernstein, Donald C. Arbitblit and Jonathan D. Selbin (collectively, Lieff Cabraser).
[2] Specifically, the written objections stated: "It is apparent that unfair, inadequate, and unreasonable compensatory awards will come from the $80 million settlement fund, therefor, I ask to seek only a punitive award from the $80 million fund. [11] I am certain that if all injured plaintiffs are made to understand Class Counsel's motion to dismiss punitive damages, we would request all $80 million be allocated to punitive damage awards. [U] I've been told the magnitude of UNOCAL'S criminal act gives Class Counsel the strongest case for punitive damages ever."
[3] The amount depended on where the claimant was located relative to the perimeter of the plume.
[4] Appellants admit that evidence forthcoming from the motion for summary judgment established that Lieff Cabraser was appointed as class counsel by the court. The allegation that the Casper Firm "associated with" Lieff Cabraser is simply untrue. The principle is one of truthful pleading. Plaintiffs may not suppress facts that prove the pleaded facts are false. (Cantu v. Resolution Trust Corp. (1992) 4 Cal.App.4th 857, 877-878, 6 Cal.Rptr.2d 151.)
[5] California courts ruling on class action issues will look to federal courts in the absence of California law on a particular subject. (Dunk v. Ford Motor Co. (1996) 48 Cal. App.4th 1794, 1801, fn. 7, 56 Cal.Rptr.2d 483.)
[6] We are mindful that appellants' cause of action for breach of fiduciary duty was also subject to Lieff Cabraser's summary judgment motion. However, the two causes are virtually identical. As we explained in part II.A., ante, after certification of the mandatory non-opt-out punitive damages class, Lieff Cabraser's duties ran to the class as a whole. Appellants have presented no cognizable arguments to the effect that Lieff Cabraser breached a fiduciary duty to the classas opposed to committing professional negligencewith respect to dismissal of the punitive damages claim. Moreover, appellants' complaint about Lieff Cabraser's actions prior to certification centered on the purported lack of notice. But that claim is nothing more than a collateral attack on the trial court's decision to approve the stipulated certification, without individual notification to class members. There was a hearing on the proposed stipulation regarding class certification, appellants' attorney attended and participated, and the court approved it as well as the stipulation for notice by publication.
[7] We will affirm a judgment if it is correct on any theory. (Davey v. Southern Pacific Co. (1897) 116 Cal. 325, 329, 48 P. 117.) The decision in Piscitelli was issued after judgment in this case. However, its application here involves only a question of law on undisputed facts, and thus no harm comes to appellants by relying on the theory of Piscitelli to affirm the judgment. (In re Marriage of Moschetta (1994) 25 Cal.App.4th 1218, 1227 & fn. 12, 30 Cal.Rptr.2d 893.)